UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————————— X

CHORD ASSOCIATES LLC, JOPAL
ENTERPRISES LLC; JOPAL ASSOCIATES INC.,
and BARBARA M. SAEPIA

                          *Plaintiffs,*

               - against -

PROTECH 2003-D, LLC; AMTAX HOLDINGS
520, LLC; PROTECH HOLDINGS 128, LLC;
CAPMARK AFFORDABLE EQUITY HOLDINGS
INC; CAPMARK FINANCE INC. (formerly known
as GMAC COMMERCIAL MORTGAGE
CORPORATION), its successors and assigns;
CAPMARK CAPITAL INC. (formerly known as
GMAC COMMERCIAL HOLDING
CORPORATION);

                       *Defendants.*    X

——————————————————————— 

Case No. 07-CV-5138 (JFB) (AKT)

**FIRST AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff's CHORD ASSOCIATES LLC, JOPAL ASOCIATES INC., JOPAL
ENTERPRISES LLC, and BARBARA M. SAEPIA, by their attorneys, allege as follows:

<u>Nature of the Action</u>

     1.    This action involves Defendants' inability to manage and complete a
senior housing development project called Belmont Villas, located in Suffolk County,
New York (the "Project") on a timely basis and within an agreed upon budget. After
failing to properly manage and complete the Project, Defendants unlawfully
appropriated Plaintiffs' entire economic interests in that Project and branded her a
scapegoat for their own negligence, misdeeds, and malfeasance.

     2.    After spending years working with the Town of Babylon to rezone,
obtain permits and to develop the property site for Belmont Villas, Barbara Saepia, who

owns and successfully manages another senior housing complex in the Town of Babylon, Suffolk County, partnered with Defendants for purposes of obtaining financing for the Project. During the course of construction, Defendants thwarted Saepia's attempt to act as the project manager, and refused to allow her to remove the Project's contractor despite Saepia's clearly expressed desire to do so. Thereafter, Defendants took over the management of the Project in June 2006, promising to complete it by October 2006, Defendants sought to completely appropriate Plaintiff's rights and interest in all management and development fees for the Project, as well as any residual equity ownership interests in the Project, thereby depriving Saepia of the economic value of years of her work and her entire equity in the deal, and resulting in millions of dollars in damages, as well as damage to Saepia's good name and reputation within the local community.

## Parties

3.     Plaintiff Chord Associates LLC ("Chord") is a New York limited liability company with its principal place of business at 865-37 County Line Road, Amityville, New York, 11701.

4.     Plaintiff Jopal Enterprises LLC ("Jopal Enterprises") is a New York limited liability company with its principal place of business at 865-37 County Line Road Amityville, New York, 11701.

5.     Plaintiff Jopal Associates Inc. ("Jopal Associates") is a New York Corporation with its principal place of Business at 865-37 County Line Road Amityville, New York, 11701.

6.     Plaintiff Barbara M. Saepia ("Saepia") is an individual who maintains her principal place of business at 865-37 County Line Road Amityville, New York, 11701. Saepia is the Managing Member of Chord and Jopal Enterprises.

7.     All plaintiffs will be referred to herein collectively as "Plaintiffs."

8.     Defendant Protech 2003-D, LLC ("Protech 2003" or "Special Member") is an Ohio limited liability company with its principal place of business at 4009 Columbus Road, S.W., Granville, Ohio, 43023 and a wholly owned subsidiary and affiliate of Capmark.

9.     Defendant AMTAX Holdings 520, LLC; ("Amtax" or "Investor Member") is an Ohio limited liability company with its principal place of business at 4009 Columbus Road, S.W., Granville, Ohio, 43023 and a wholly owned subsidiary and affiliate of Capmark, defined below.

10.     Defendant Protech Holdings 128, LLC ("Protech Holdings" or "Class A Special Member") is an Ohio limited liability company with its principal place of business at 4009 Columbus Road, S.W., Granville, Ohio, 43023 and a wholly owned subsidiary and affiliate of Capmark.

11.     Protech 2003, Amtax, and Protech Holdings, collectively, are at times referred to herein as "Limited Members," and their membership interests in the Project is referred to as the "Limited Members' Interests".   The Limited Members were affiliates of the Paramount Financial Group ("Paramount"), which is now a part of Capmark Finance Inc.

12.     Defendant Capmark Finance Inc. ("Capmark or Lender"), formerly known as GMAC Commercial Mortgage Corporation ("GMAC"), is a California

3

corporation with its principal place of business at 116 Welsh Road, Horsham, Pennsylvania, 19044.

13.     Defendant Capmark Affordable Equity Holdings Inc. ("Capmark Affordable") is a Colorado corporation with its principal place of business at 1801 California Street, Suite 3900, Denver, Colorado, 80202, and is an affiliate of Capmark.

14.     Defendant Capmark Capital Inc. ("Capmark Capital") is a Colorado corporation with its principal place of business at 1801 California Street, Suite 3900, Denver, Colorado, 80202, and is an affiliate of Capmark.

15.     All defendants will be referred to herein collectively as "Defendants" or as "Capmark and its Affiliates."

<u>Jurisdiction and Venue</u>

16.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) as this is an action between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district, Plaintiffs reside in this district, the property involved in the action is located in this district, and the parties have by contract consented to venue in this district.

<u>Facts</u>

18.     In February 2001, Saepia, through Jopal Enterprises, purchased an approximately 11 acre parcel located at 500 Bonnie Lane (a.k.a. 435 Wyandanch Avenue), West Babylon, New York, 11704 (the "Property").  At the time the Property had a market value of not less than $4,350,000.00.

19.     Saepia, through Jopal Enterprises, thereafter began to develop the Project—a retirement community now known as Belmont Villas.   Ultimately, the Project would consist of 164 units of affordable housing within eight two story multi-family rental apartment buildings and a community building at a total anticipated cost of approximately $32 million ("Project").

20.     Jopal Enterprises, at its own initiative and expense, obtained the Property's rezoning and the permits required to have the Property developed as affordable senior housing.

21.     In October 2003, Saepia formed Belmont Villas LLC ("Belmont"), pursuant to the Original Operating Agreement ("Original Operating Agreement") which consists of two members: Chord, as the Managing Member, and Saepia as the second member. Saepia was, and remains, the sole member of Chord.

22.     In December 2003, Jopal Enterprises transferred title to the Property to Belmont.

23.     The Project was to be financed in part through tax-exempt bonds, applied for and approved to Plaintiff, in the amount of $18,255,000 (the "Bonds") issued by the Suffolk County Industrial Development Agent (the "IDA" or "Issuer").   The Bonds provided for an as-of-right allocation of Low Income Housing Tax Credits, valued at approximately $9.3 million (the "Tax Credit Equity") that, together with the proceeds from the sale of the Bonds, would constitute a majority of the Project's financing.

24.     Belmont entered into an Installment Sale Agreement ("Installment Sale Agreement") with the IDA dated as of December 1, 2003 and amended as of October 1, 2004 when the Defendants were first inducted into Belmont as investors. Pursuant to

that agreement, fee title to the Property was vested to the IDA, with Belmont designated as the Beneficial Owner and with title reverting to Belmont after 15 years of operation as an affordable housing project (*i.e.*, in the year 2020) pursuant to Tax Regulatory Agreement Dated December 30, 2003 by and between Belmont Villas LLC, the IDA, and Wachovia Bank, NA, as Trustee ("Regulatory Agreement").

25.      The Regulatory Agreement requires that the Project be occupied by persons or families of low or moderate income pursuant to the restrictions set forth in said agreement and under Section 42 of the Internal Revenue Code, and that such restrictions run with the owner's interest in the land and be binding on all of owner's successors, assigns, heirs, grantees or lessees for not less than 15 years.

26.      In 2003, Jopal Enterprises began discussions with GMAC (later known as Capmark Finance Inc.) and its then-affiliate Paramount, along with other financial institutions, so as to underwrite and syndicate the Project's financing.

27.      Ultimately, in connection with a closing held in October 2004 ("Closing"), Capmark and its Affiliates provided the value of the Tax Credit Equity and additional construction financing (in the amount of the Bonds) for the Project, and arranged for the Project's permanent financing.  The numerous agreements and documents executed in connection with the Closing are referred to generally herein as the "Project Documents."

28.      The Project Documents include a Construction Phase Financing Agreement, dated October 1, 2004, whereby The Federal National Mortgage Association ("Fannie Mae") agreed to issue a direct pay irrevocable transferable credit enhancement instrument providing credit enhancement and liquidity support for the

Bonds through the period ending on April 15, 2007. This credit enhancement instrument was delivered to Wachovia Bank, NA ("Wachovia"), which during construction of the Project, acted as a trustee to disburse the proceeds from the sale of the Bonds.

29.     The Project Documents also include a Key Principal Guaranty Agreement entered into as of October 1, 2004 between Saepia and Fannie Mae, among other guarantees,  which agreement recognizes Saepia's ownership and financial interest in Belmont and which provides a guaranty by Saepia for certain of Belmont's obligations under various agreements between Belmont and Fannie Mae and others in connection with Fannie Mae's agreement to provide the credit enhancement and liquidity support for the Bonds.

30.     The Project Documents dated October 2004 further include a Construction Agreement between Belmont and Capmark and an Amended and Restated Operating Agreement ("2004 Amended Operating Agreement") admitting the Limited Members to Belmont, both entered into as of October 1, 2004.

31.     In addition, pursuant to a Right of First Refusal and Purchase Option Agreement, dated as of October 1, 2004, ("Right of First Refusal"), Amtax Holdings 520, LLC and Protech 2003-D, LLC, as members of Belmont Villas LLC, agreed not to transfer, sell, alienate, give, bequeath, or otherwise dispose of the Project to any party without first offering the right to purchase the Project to Chord.

32.     At the time of the Closing, it was anticipated by Plaintiffs and Defendants that the Project would be substantially completed during 2006.

33.     In addition, pursuant to a Turnkey Development Agreement, dated October 1, 2004 (the "Development Agreement"), Saepia (through Jopal Enterprises)

agreed to oversee the development and construction of the Project in the name of, and on behalf of, Belmont, in return for a development fee which, at the time of Closing, was anticipated to be $3,682,330 payable over time from the Project's cash flow (rental income). It was further anticipated at the time of Closing that Saepia, through Jopal Associates and Chord, would receive, pursuant to the 2004 Amended Operating Agreement and Property Management Agreement, respectively, millions of dollars more in various management fees over the life of the Project, including 8% of each month's gross income from the Project, as well as be entitled to a substantial residual interest in the proceeds of any sale of the Project at the conclusion of the 15-year Bond period, also worth several millions of dollars.

34.     After the Closing, and up until June 2006, Saepia (through Chord) acted as the construction manager pursuant to the 2004 Amended Operating Agreement. Saepia, through Jopal Enterprises, also acted as the Developer of the Project. In those roles, Saepia spent a significant amount of time managing the construction and development of the Project on a day-to-day basis, including working closely with the Town of Babylon and other government officials to obtain necessary permits and environmental approvals for the Project and with various third-party vendors (architects, contractors, and engineers) who were hired to perform tasks necessary to complete the Project.

35.     One of those vendors was Condos Bros. Construction Corp. ("Condos"). Joseph Kalinowski ("Kalinowski"), a project manager for Condos, submitted a site work proposal to Belmont for the Project on behalf of Condos. By contract executed August 19, 2004 between Belmont and Condos, Condos agreed to perform and complete all site

work required at the Project for $3,614,000 over a term of 13 months ("Site Work Contract").  The Site Work Contract called for well drilling, dewatering, excavation, and fabrication of the sanitary force main.

36.     Despite Condos's representations, they lacked the necessary experience in well drilling, dewatering, excavation, and force main fabrication necessary to fulfill its obligations under the Site Work Contract.  This resulted, in turn, in delays and an inability to finish certain aspects of the Project on a timely basis.  Condos also charged the Project for work that was either unjustified or had not been adequately performed.

37.     When these facts became evident to Saepia, she sought to have Condos removed from the Project, but Defendants refused.

38.     By January 2006, Capmark and its Affiliates were fully aware that: (i) Saepia had several disagreements with Condos over its work on the Project; (ii) Saepia believed Condos had not met its obligations under the Site Work Contract; (iii) Condos had delayed the completion of the Project due to its incompetence and dishonesty; and (iv) that Condos should be terminated from performing any further work on the Project; and (v) that the architect and engineer agreed that Condos should be removed.

39.     On January 31, 2006, a representative of Capmark, Vice President Frank Guzauskas ("Guzauskas"), attended a site meeting with Saepia and others. Although Guzauskas had been made aware of Saepia's views regarding Condos for several months, he nonetheless allowed Condos to remain on the job after the January 31, 2006 meeting.

40.     Saepia met with Capmark representative, Phil Pavlovicz ("Pavlovicz"), and others on or about March 23, 2006, in Melville, New York.  At that meeting, Saepia

again requested that Capmark consent to the replacement of Condos.  Capmark and its Affiliates again refused to allow Plaintiffs to replace Condos.

41.     Pavlovicz's refusal to remove Condos echoed an earlier March 9, 2006 email he wrote to Saepia, in which he stated in part as follows:

> Barbara:
>
> After a short discussion with Frank Guzauskas today, ***I would request that you hold off on any formal actions regarding tranference [sic] of work from Condos Bros to another Contractor.***  Frank and I will be at the site next Tuesday morning and would like to discuss the issues in detail before you move forward. I know you understand that this is a sensitive matter that can impact construction progress. ***Additionally, this type of action requires lender approval.*** While we are on site next Tuesday, we would like to meet with all parties to ensure a smooth transition if an agreement can be reached that is mutually beneficial to the project team as a whole. (Emphasis added).

42.     Because Capmark would not approve, Saepia did not terminate Condos. This disagreement over using Condos ultimately led to a forced renegotiation in the Spring of 2006 of the Operating and Construction Agreements between Plaintiffs and Defendants ("Amendments"). Defendants eventually replaced Condos with a new site contractor citing Condos unjustified and inflated change orders as partial cause for their removal, after which Condos placed a Mechanics Lien on the Project. In June 2006, pursuant to the First Amendment to the Amended and Restated Operating Agreement, ("2006 Amended Operating Agreement"), Saepia agreed to a reduction in Chord's role in the Project and agreed that management of construction of the Project would be delegated to Protech Holdings.

43.     Section  7.4.4 of the 2006 Amended Operating Agreement thus provides:

> 7.4.4.  The Managing Member [Chord] is responsible for various obligations with respect to the construction of the

Project and the operation of the Company, including, without limitation, enforcing the Turnkey Development Agreement, the Construction Contract and causing construction completion of the Project in accordance with the requirements of this Agreement and the Project Documents. The Managing Member recognizes that the **Class A Special Member [Protech Holdings] and/or its affiliates have certain resources and experience** that are beneficial to the performance of such obligations and therefore desires to delegate to the Class A Special Member completion of certain tasks. Accordingly, notwithstanding anything set forth in this Agreement apparently to the contrary, the Managing Member hereby **delegates to the Class A Special Member the right to take such actions on behalf of the Company as may be necessary or desirable to cause the Company or the Developer to complete the construction** of the Improvements in accordance with the Project Documents… (Emphasis added).

44.     The purported "resources and experience" of Defendants were material inducements for Saepia to agree to execute the 2006 Amended Operating Agreement on behalf of Chord.

45.     In addition, Defendants threatened Saepia that the Project would not be funded to completion unless she agreed to execute the 2006 Amended Operating Agreement.

46.     By 2006, Saepia had spent years working on the management and development of the Project without any compensation from Capmark and its Affiliates. For her years of dedicated work, she anticipated receiving substantial management and development fees in connection with the Project that would be due to her under the 2004 Amended Operating Agreement and other Project Documents.

47.     In consideration for executing the 2006 Amended Operating Agreement, Capmark and its Affiliates agreed, among other things, that the Project would be completed by October 31, 2006 at a total estimated cost of $35,653,717.31.  The new

11

Project completion date is reflected in the First Amendment to the Construction Agreement, dated June 2006 ("October 31, 2006 Deadline").

48.     At the time of execution of the 2006 Amended Operating Agreement, the Project was at least seventy-five (75%) complete, despite the delays and overcharges resulting from work by Condos.  Capmark's own Construction Monitoring Report dated July 5, 2006 states that, as of June 27, 2006 (immediately after execution of 2006 Amended Operating Agreement), the Project's completion percentage was observed to be 87% and the projected completion date was October 1, 2006.  That report also stated that "Capmark assumed control over construction on 6/20/06.  Presently, the project source and use is in balance and should be sufficient to complete construction."

49.     Despite taking over the management of the Project, Defendants did not complete it by October 31, 2006 and have greatly exceeded the anticipated budget.  By email dated November 7, 2006, a week after having missed the October 31, 2006 Deadline, Capmark's Guzauskas called a progress meeting for November 9, stating: "Seeing as how we are at a critical stage in completing this project, I would assume that everyone will attend this meeting.  *I see no acceptable excuses for not wrapping this job up in the near future."*  (Emphasis added).

50.     Yet on November 20, 2006, Capmark reported that, despite their failure to comply with the 2006 Amended Operating and Construction Agreements, the projected completion date was unilaterally extended by Defendants to May 30, 2007 without the benefit of the necessary adjustment to the timetable and budget requiring mutual agreement by the Plaintiffs. Despite Defendants' failure to provide revised Amendments and necessary financial data, Saepia, as an act of good faith and in effort to

preserve the Project's financing, executed on behalf of the Project an April 2007 extension agreement with Fannie Mae.

51.     The Town of Babylon became increasingly concerned in early 2007 about the lack of progress on the Project. By e-mail dated March 15, 2007, Saepia advised Pavlovicz of Capmark:

> I have been contacted by Commissioner Peter Casserly from the Town of Babylon who indicated that members of the Town Board are upset and concerned about the lack o*f progress at the site.  They are receiving many calls from their constituent*s who had been told that the units would be ready for occupancy last year or early this year, Some have already sold their homes and have been imposing themselves on relatives while waiting for Belmont to open. The [2006] Amended Operating Agreement I signed relinquishing my control over remaining construction matters indicated that the construction was to be completed by October 2006 and I relied on that commitment while certifying prospective tenants.
>
> Commissioner Casserly understands that I have no say in construction matters at the site.  He has asked me to set up a meeting at his office as soon as possible with whomever is in control to explain why the project is apparently at a standstill.  He thinks it is unfathomable that the force main has not yet been started...
>
> In light of the above, please let me know when you will be available to join me at Town Hall to meet with the Commissioner.
>
> Thank you.
>
> Barbara

52.     Pavlovicz failed to set up a meeting with the Town of Babylon as requested.

53.     In response, Peter Casserly, the Town of Babylon's Commissioner of Planning and Development (the "Commissioner") by letter dated March 20, 2007, wrote as follows:

> Please be advised that the Town of Babylon is dissatisfied with the amount of progress made to the above mentioned site. If we [do] not see significant progress within the next two weeks a hearing will be scheduled to revoke all building permits.

54.     Thereafter, a hearing was held on May 22, 2007 concerning Belmont Villas.  After that hearing, by letter dated May 30, 2007, the Commissioner suspended "all building permits" for the Project citing "excessive delays in completing this project and a growing concern regarding the quality of construction."  The letter went on to state that, "[a]t this point, the Town of Babylon has serious legitimate concerns regarding your ability to complete this job even in light of GMAC/Capmark assuming control over construction approximately one year ago."

55.     After further correspondence between the Town of Babylon and with Capmark, including assurances by Capmark concerning the proper remediation of some mold growth at the site and the removal of contaminated soil and materials, the suspension of building permits was lifted in late June 2007.

56.     By late Summer 2007, it became clear that the Fannie Mae Construction Phase Financing Agreement would need to be again extended. That previously extended agreement only provided for credit enhancement and liquidity support for the Bonds through October 15, 2007.  On August 9, 2007, Fannie Mae thus sent a letter to Guzauskas at Capmark, as well as to Saepia, requiring, certain affirmative representations and warranties in order to extend the termination date of the Construction Phase Financing Agreement.

57.     Since February 2007, Saepia had repeatedly requested financial and construction information from Capmark and its Affiliates concerning the status of the Project, which Saepia reasonably required in order to execute the extension letter, Defendants failed to provide the necessary information to Saepia, thus making her unable to make the required representations and warranties to Fannie Mae, particularly with respect to Project costs, and thus as to the Project's continued eligibility for the extension of the financing.

58.     Instead, Defendants decided, without notice, to remove Chord (and thus, Saepia) as the Managing Member of Belmont on October 10, 2007, just days before the extension letter had to be filed.  Defendants thereafter executed the extension letter on behalf of Protech as the new Managing Member of Belmont, and simply crossed out any signature line seeking Saepia's signature.

59.     In addition to the issue surrounding Saepia's refusal to sign the Fannie Mae extension letter, Capmark and its Affiliates maintained in their October 10, 2007 letter that Chord was removed as the Managing Member of Belmont because of a purported refusal to execute certain utility easements to allow the Long Island Power Authority ("LIPA") access to the Property, and because Chord supposedly attempted to suspend or terminate construction at the Project by communicating with the Town of Babylon.

60.     Defendants' purported reasons for removing Chord (and thus Saepia) as the Managing Member of Belmont were unjustified, without basis in fact, and served as a pretext for Defendants to attempt a complete evisceration of Plaintiffs' economic and financial interest in the Project.

61.     Capmark and its Affiliates' removal notice was improper, unjustified, and motivated by Defendants' desire to reconstitute Belmont to Defendants' economic advantage after the Project had been badly managed by them for well over a year.

62.     By executing the Draw Requests on behalf of both Borrower and Lender, Defendants, created conflicts of interest whereby they gained an inappropriate advantage, the exercise of which has harmed Plaintiffs' economic interests in the Project, including, but not limited to, unjustified delays and cost overruns which have enriched Defendants, and caused Plaintiffs the loss of income.

63.     Upon information and belief, as of the date of this filing—almost *three years* after Defendants took over day to day management responsibility for the Project — the Project, which was 75% built at the time Defendants assumed control of the construction, has still not received all of the necessary Certificates of Occupancy and is still not completed.

64.     Plaintiff demands trial by jury of all issues relating to all claims herein.

## FIRST CLAIM:
## BREACH OF CONTRACT

### (ALL DEFENDANTS)

65.     Plaintiffs repeat and reallege paragraph 1 through 64 hereof as if fully set forth herein.

66.     In June 2006, Plaintiffs relinquished certain day-to-day management responsibilities in the Project as a result of Defendant's representations concerning their purported expertise, as well as their threats to withhold financing in connection with the project.

67.   . Specifically, the 2006 Amended Operating Agreement and First Amendment to the Construction Agreement required Defendants to complete the Project by the October 31, 2006 Deadline at a total cost of no more than $35,653,717.31.

68.   Defendants did not complete the Project on time or within budget.   In fact, upon information and belief, the Project is still incomplete almost three years after Defendants took over management of the Project..

69.   Since taking over responsibility for the Project, Defendants have mismanaged the construction of the Project and have incurred millions of dollars in excess costs.

70.   Defendants breached their contractual obligations to Plaintiffs.

71.   As a result of Defendants' breach, they are responsible for damages to Plaintiffs amounting to millions of dollars in lost and delayed development and management fees and the elimination of Plaintiffs' equity interest in the Project.

72.   Additionally, defendants conduct in refusing to renegotiate an additional Amendment that would have addressed the need for a revised budget and completion date after Defendants' default has caused Plaintiffs significant injury, for which Defendant's are responsible.

### SECOND CLAIM:
### BREACH OF CONTRACT

### (ALL DEFENDANTS)

73.   Plaintiffs repeat and reallege paragraph 1 through 72 hereof as if fully set forth herein.

74.   Chord was the Managing Member of Belmont.

75.     On October 10, 2007, without notice, Defendants removed Chord as the Managing Member of Belmont.

76.     Defendants had no cause or justification for the removal of Chord as the Managing Member of Belmont.

77.     By its conduct, Defendants breached their contractual obligations to Plaintiffs as set forth in the 2004 and 2006 Amended Operating Agreements and other Project Documents.

78.     The removal of Chord as the Managing Member of Belmont has damaged Plaintiffs by depriving them of their financial and economic interests in the Project, including depriving Plaintiffs of any development and management fees as well as their residual rights to a certain portion of the Project's sale proceeds at the end of the 15-year Bond period, and their right of first refusal.

## THIRD CLAIM:
## NEGLIGENCE

### (AGAINST ALL DEFENDANTS)

79.     Plaintiffs repeat and reallege paragraph 1 through 78 hereof as if fully set forth herein.

80.     The 2006 Amended Operating Agreement and 2006 Amended Construction Agreement required Defendants to complete the Project by the October 31, 2006 Deadline at a total cost of no more than $35,653,717.31.

81.     Defendants owed a duty to Plaintiffs to manage the Project responsibly and in accordance with their purported special expertise.

82.     Defendants breached their duty to Plaintiffs to manage the Project appropriately and professionally and with the appropriate standard of care within the industry.

83.     Defendants' conduct has caused the Project to be substantially delayed and has resulted in millions of dollars in cost overruns.

84.     Defendants' conduct injured Plaintiffs by reducing the overall value of the Project, eviscerating Plaintiffs' rights to collect management and development fees, and by injuring Plaintiffs' reputation; all of which were reasonably foreseeable consequences of Defendants' negligent conduct.

85.     Defendants are liable for damages to Plaintiffs amounting to millions of dollars in lost and delayed development and management fees and a reduction in any equity interest in the Project.

**FOURTH CLAIM:**
**QUANTUM MERUIT**

**(ALL DEFENDANTS)**

86.     Plaintiffs repeat and reallege paragraph 1 through 85 hereof as if fully set forth herein.

87.     Until June 2006, Ms. Saepia expended substantial amounts of time and effort in connection with the Project, including obtaining permits, working with the Town of Babylon, and managing the Project. Between June 2006 and October 2007 Saepia expended additional amounts of time and effort in the renting of the units and communicating to the best of her ability with the various Town and County agencies and utilities, all in good faith.

88.     By the time Defendants became responsible for managing the Project on a day-to-day basis, in June 2006, the Project was already at least eighty seven (87%) complete.

89.     Defendants knew that Ms. Saepia expected compensation for her services, and she is entitled to be paid for the fair value of her work and her efforts in developing the Project up to and through October 2007.

90.     Defendants have never compensated Ms. Saepia for her work and efforts on the Project, and Defendants' removal of Chord as a Managing Member of Belmont stripped Ms. Saepia of her ability to receive any management or development fees owed to her.

91.     Defendants owe Plaintiffs compensation for their time and effort working on the Project prior to the time of Defendants unjustified removal of Plaintiffs.

**FIFTH CLAIM:**
**PROMISSORY ESTOPPEL**

**(ALL DEFENDANTS)**

92.     Plaintiffs repeat and reallege paragraph 1 through 91 hereof as if fully set forth herein.

93.     Ms. Saepia, on behalf of Chord, reasonably relied upon Defendants' clear and unambiguous promises and representations concerning their special experience, skill and knowledge, and thereby agreed to enter into the 2006 Amendments by which Defendants clearly and unambiguously represented to Plaintiffs that they would complete the Project by the October 31, 2006 Deadline at a total cost of no more than $35,653,717.31.

94.     In fact, upon information and belief, the Project is still incomplete almost three years after Defendants took over managing the Project.

95.     Plaintiffs relied to their detriment on Defendants' representations and relinquished certain day-to-day management responsibilities in the Project as a result of Defendants' representations concerning their expertise and their threats to withhold financing in connection with the Project.

96.     As a result of Plaintiffs' reasonable reliance on Defendants' representations and conduct with respect to the Project, Plaintiffs have incurred damages and unconscionable injury amounting to millions of dollars in lost and delayed development and management fees and a reduction in Plaintiffs' equity interest in the Project.

**SIXTH CLAIM:**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(ALL DEFENDANTS)**

97.     Plaintiffs repeat and reallege paragraph 1 through 96 hereof as if fully set forth herein.

98.     By threatening to withdraw financing for the Project, Defendants did not deal in good faith with Plaintiffs when seeking to enter into the 2006 Amendments. After entering into the 2006 Amendments, Defendants failed to provide Plaintiffs with information necessary for Plaintiffs to execute the Fannie Mae extension letter in violation of that agreement and other Project Documents, and then in retribution for Plaintiff's expressed inability to do so, removed Chord as the Managing Member of Belmont.

99.     Through their conduct, Defendants breached their obligation of good faith and fair dealing that is implied under New York law on the parties to every contract.

100.    Defendants have caused Plaintiffs' damages amounting to millions of dollars in lost and delayed development and management fees and a reduction in any equity interest in the Project.  Defendants' conduct has also deprived Plaintiffs of their financial and economic interests in the Project, including depriving Plaintiffs of any earned development and management fees as well as their residual rights to a certain portion of the sale proceeds at the end of the 15-year Bond period.

<u>**SEVENTH CLAIM FOR RELIEF:**</u>
<u>**BREACH OF FIDUCIARY DUTY**</u>

<u>**(ALL DEFENDANTS)**</u>

101.    Plaintiffs repeat and reallege paragraph 1 through 100 hereof as if fully set forth herein.

102.    In June 2006, when Defendants assumed responsibility for managing construction and completion of the Project, Defendants assumed a fiduciary obligation to Plaintiffs.

103.    Defendants breached their fiduciary obligations to Plaintiffs by the conduct set forth herein.

104.    Defendants' conduct has caused Plaintiffs damage amounting to millions of dollars in lost and delayed development and management fees and a reduction in any equity interest in the Project.  Defendants' conduct has also deprived Plaintiffs of their financial and economic interests in the Project, including depriving Plaintiffs of any

earned development and management fees as well as their residual rights to a certain portion of the sale proceeds at the end of the 15-year Bond period.

**EIGHTH CLAIM FOR RELIEF:**
**FRAUD IN THE INDUCEMENT**

**(ALL DEFENDANTS)**

105.    Plaintiffs repeat and reallege paragraph 1 through 104 hereof as if fully set forth herein.

106.    Defendants induced Plaintiffs into entering into the 2006 Amendments by knowingly and falsely representing that they had special expertise and experience to complete the Project by the October 31, 2006 Deadline at a total cost of no more than $35,653,717.31.

107.    Defendants' false statements induced Plaintiff to reasonably rely upon Defendants' ability to complete the Project at a specified time and budget.

108.    As a result of Plaintiffs' reasonable reliance upon Defendants' knowingly false statements, Plaintiffs have been damaged by millions of dollars in lost and delayed development and management fees and a reduction in any equity interest in the Project.

**NINTH CLAIM FOR RELIEF:**
**DEFAMATION**

**(AGAINST ALL DEFENDANTS)**

109.    Plaintiffs repeat and reallege paragraph 1 through 108 hereof as if fully set forth herein.

110.    Defendants' transmittals of emails and other communications to the Town of Babylon, County and State agencies and utilities, contractors, engineers and architects regarding the removal of Chord as the Managing Member of Belmont was

malicious and contained knowingly false statements regarding Plaintiffs' management of the Project.

111.    Defendants knowingly, in bad faith, and without any privilege, transmitted and published such information to third parties, including the Town of Babylon, County and State agencies and utilities, contractors, engineers, and architects.

112.    By its conduct Defendants have defamed Plaintiffs and have caused significant damage to Saepia's reputation in the community where she works, thereby causing damage to Saepia's livelihood.

## TENTH CLAIM FOR RELIEF:
## UNJUST ENRICHMENT

## (ALL DEFENDANTS)

113.    Plaintiffs repeat and reallege paragraph 1 through 112 hereof as if fully set forth herein.

114.    Defendants were enriched at Plaintiffs' expense and obtained valuable benefits from Plaintiffs, including, but not limited to, appropriation of Plaintiffs' rights and interests to the property on which the Project is located that Plaintiffs originally provided to Belmont Villas LLC, as well as substantial work performed by Saepia, Jopal Enterprises, and Chord in the development and management of the Project and improvement of the land through October 2007.

115.    Such benefits to Defendants included pre-construction development, obtaining permits, negotiating contracts with the various contractors, engineers, and architects, and all management and development duties performed by Plaintiffs resulting in completion of 87% of the Project's construction by June 2006.

116.    Plaintiffs did not confer these benefits gratuitously, and Defendants knew that Plaintiffs expected compensation.

117.    In equity and good conscience, Defendants should pay Plaintiffs the reasonable value of benefits received.

**ELEVENTH CLAIM**
**EXERCISE OF IMPROPER CONTROL**

**(ALL DEFENDANTS)**

118.    Plaintiffs repeat and reallege paragraph 1 through 117 hereof as if fully set forth herein.

119.    By executing the Amendments, Defendants assumed daily operational control for the Project, and with it the duty and responsibility of achieving Project Completion by the October 31, 2006 deadline as required under the Amendments.

120.    Upon execution of the Amendments, Defendants took over the sole control of, *inter alia*: (i) Belmont's disbursements, and mandated which creditors would be paid; (ii) Belmont's choice of employment of third parties, including the newly appointed Construction Manager, Greyhawk; (iii) and; Belmont's ability to have its affairs managed by competent personnel with undivided loyalties of its own choosing.

121.    By failing to attain Project completion by the October 31, 2006 Deadline, Defendants' exercise of said undue control was to Plaintiffs' significant detriment, including, but not limited to, unjustified cost overruns which enriched Defendants, and loss of income

122.    Defendants' conduct in refusing to renegotiate an additional Amendment that would address the need for a revised budget and completion date after Defendants' default, has caused Plaintiffs significant injury, for which Defendants are responsible.

## TWELFTH CLAIM
## TORTIOUS INTERFERENCE WITH CONTRACTS

### (ALL DEFENDANTS)

123.   Plaintiffs repeat and reallege paragraph 1 through 122 hereof as if fully set forth herein.

124.   Capmark's and its Affiliates conduct, including, but not limited to: (i) their refusal to dismiss Condos and call its performance bond; (ii) their refusal to continue to fund the Project unless Plaintiffs executed the Amendments; (iii) their continual funding of bogus draw requests; (iv) their breach of the Amendments, thereby causing Plaintiffs to be unable to deliver the apartments to various parties to the Project documents, as well as to prospective tenants; (v) their callous disregard for Plaintiffs obligations under the Saepia's guarantees so as to increase Plaintiffs' exposure thereunder; (vi) their wrongful removal of Chord as Managing Member of Belmont; and (vii), their wrongful termination of the Turnkey Development Agreement, has harmed Plaintiffs' economic interests in the Project, including, but not limited to, unjustified cost overruns which have enriched Defendants, and caused Plaintiffs the loss of income.

125.   Defendants' conduct has caused Plaintiffs significant injury, for which Defendants are responsible.

**WHEREFORE,** Plaintiffs demand judgment as follows:

1.   Damages in an amount to be determined at trial but comprising no less than all earned and expected development and management fees and the value of all other economic interests in the Project to which Plaintiffs are entitled;

2.      Punitive damages in connection with Defendants' knowingly false representations to Plaintiffs and their mismanagement of the Project that has harmed the public;

3.      An accounting of the Project's costs and overruns since June 2006;

4.      A declaration of the contractual rights of the parties under the contract;

5.      Attorneys fees and costs of this litigation; and

6.      Such other relief as the Court deems just and proper.

Dated:   Hicksville, New York
         April  19, 2009

> **Law Offices of Andrew S. Donner**
> *Co-Counsel for Plaintiffs*
>
> By:   _____
>       Andrew S. Donner (ASD-9895)
>       25 Newbridge Road
>       Hicksville, New York 11801
>       (516) 605-1108
>
> **Bruce H. Kaplan**
> *Co-Counsel for Plaintiffs*
>
> By:   _____
>       Bruce H. Kaplan
>       35 Pinelawn Road, S104E
>       Melville, N.Y. 11747
>       (631)554-4626