# THE LAW OFFICES
## OF
# ANDREW S. DONNER

Telephone: (516) 605-1108  Fax: (516) 605-1084

25 NEWBRIDGE ROAD.
SUITE 420                                              ALSO ADMITTED INARIZONA
HICKSVILLE, NEW YORK 11801

E-mail: asdlaw@aol.com                                 Of counsel:
98 CUTTER MILL ROAD                                    HILLARY B. BLUMENTHAL
GREAT NECK, NY 11021                                   KEITH LEPACK
(BY APPOINTMENT ONLY)                                  DAN BUTTAFUOCO
Address all correspondence to: Plainview               CHRISTOPHER J. LITREL

June 17, 2009
Honorable Kathleen Tomlinson
U.S. Magistrate Judge
U.S. District Court, E.D.N.Y.
100 Federal Plaza
Central Islip, New York 11722-9014

        Re:    Chord Associates, LLC  *et al*. v. Protech 2003-D, LLC *et al*.
               EDNY Case No. 07 CV 5138 (JFB)

Dear Judge Tomlinson:

        I write in response to Defendants' counsels' letter (Docket No.:114) ostensibly seeking "to supplement Defendant's motions to compel."

        Notwithstanding counsels characterization of their intent, the content and substance of the correspondence seeks to raise a new issue, to wit, Defendants desire to depose Plaintiff Barbara Saepia for a fourth day. To attempt to add that matter to the Courts docket for consideration merely forty eight hours prior to the currently scheduled hearing gives rise at the very least to the motivation in so doing.  Searching the transcript of a three day deposition, to specifically refute most, if not all of defendant's contentions is an arduous task that should not have to be accomplished in such limited time. That said, I will make every attempt to at the very least, set the record straight clarify Defendants omissions and address their errors and misstatements.

        Counsel contends "Plaintiff improperly cut the deposition short…".  The video and written transcript of the depositions are unrebuttable evidence that contrary to counsels assertions there were neither lengthy speaking objections (and for that matter very few objections at all) nor obstruction by the witness. The record will lay bare proof that the witness kept her composure in the face of badgering that included being asked basically the same question approximately eighteen times at the end of an eight and one-half hour deposition on the third day of her testimony (pages 257-266 of the deposition are attached). Again, the record will reveal that contrary to counsels assertions plaintiff did not "largely give "I do not recall" answers and on the

occasions when she did they were truthful and responsive answers. This is in sharp contrast to, for example, Defendants witness Frank Guzauskas who responded to my inquiries in excess of **two hundred sixty times**, that he "did not recall". That being said, on more than one occasion counsel admonished the witness that she could answer, yes, no, or I don't recall and on at least one occasion when the witness responded that she could not recall, counsel badgered the witness, sarcastically asking "do you know the difference between I don't recall and no…?", after asking the same question numerous times. (see transcript pages 240-244).

Counsel goes on to contend that "Plaintiffs appear to be raising a defense of reliance on counsel in connection with, among other things, their failure to sign the extension agreement…" The witness was asked about her decision not to sign the Fannie Mae extension in excess of twenty times, eighteen in succession at the end of the deposition (transcript pages 257-266) and she answered consistently and non-evasively despite counsels badgering and attempts to put words in her mouth and otherwise trick her. There is absolutely no attempt to hide behind privilege in the witnesses responses to why she didn't sign the Fannie Mae letter. For reasons of her own, counsel has chosen to offer the court limited disjointed statements, taken out of context. I have attempted to offer the Court a more complete depiction and offer the Court the full transcript should they so desire.

In a footnote, counsel contends "According to the court certified videographer, Ms. Saepia testified for 4 hours and 52 minutes the first day and less than 7 hours on the second and third days." While I will assume for the moment that that is what the videographers' record shows, it is not an accurate representation of Ms. Saepias availability. The building records will show that on each of the three days we appeared at Defendants offices prior to ten o'clock a.m. and the witness was prepared to be deposed. Defendants delayed the beginning of each day of testimony as they put together their files and conferred together and with their client. In addition, Defendants quite frequently requested and/or extended interim and lunch breaks to confer internally, requesting that the witness and I remain outside the conference area as a courtesy. I refer to this at some point(s) of the transcript. While it is clearly counsels' prerogative to do so, it should not be an excuse to extend the witnesses deposition time, particularly given how extensive the time was. While I advised counsel early in the course of Tuesday's deposition that I had to leave at about 6:00 P.M. so I could return to Long Island for a 7:30 meeting, I offered to extend the hours on Wednesday and Thursday and did so. The record will reflect that it was counsel who chose to end Wednesdays deposition, though I offered to allow her to continue somewhat longer (we ended at approximately 6:30 P.M. ), and on Thursday we again ended at about 6:30 P.M. Counsel will acknowledge, and the record will reflect, that the witness was available for 7.5 hours of testimony on Tuesday, 8.5 on Wednesday and 8.5 on Thursday. Assuming reasonable breaks, she was available for in excess of the 21 hours the rules call for. That counsel and defendants chose to utilize some of that time to strategize privately should not be the basis to further inconvenience the witness, particularly when counsel is conceding she testified for at least 19 hours.

Finally, counsels contention that the witness "put the communication at issue with respect to the claim or defense" is contradicted, on at least 20 occasions, by the testimony of the witness who was quite clear, consistent and forthright on the subject both in her testimony, and by the letter counsel refers to. It is apparent from the record that rather than seek to elicit truthful

testimony, counsel badgered the witness in an attempt to create a false controversy. Her reference to counsels' retainer letter as it pertains to the Fannie Mae extension is misstated as well. Counsels demand for production of all communications with counsel is rather transparent, but, none-the-less something Plaintiff might stipulate to if all parties were similarly directed.

Accordingly, defendant's demands, to the extent they are being demanded for the first time in their letter motion (Docket 114), should be denied as untimely and/or should be denied for the reasons set forth herein.

.

Very truly yours,

Andrew S. Donner

cc: Catherine McGrath, Esq.

1

2      Did you respond?

3            A.   I don't recall that I responded.

4            Q.   In fact did you deliberately not

5      respond?

6            A.   I don't recall that I responded

7      to this e-mail.

8            Q.   I'll put the question to you

9      again, was it the case that you deliberately

10      did not respond?

11            A.   I will answer I did not respond

12      to this e-mail.  I don't recall responding to

13    this e-mail.

14         Q.   It was your intention that you

15    did not respond?

16         A.   I'll say I don't recall

17    responding to this e-mail.

18         Q.   Was it one of those things you

19    said I'll get around to responding to it and

20    you forgot to do so?

21         A.   I had discussions with counsel

22    regarding this e-mail so I didn't --

23         Q.   There after you did not respond

24    to this e-mail?

25         A.   I don't recall responding to

241

1

2    this e-mail.

3         Q.   You don't recall responding to

4    it because you didn't, correct?

5         A.   I said I don't recall responding

6    to this e-mail.

7         Q.   Are you telling me it's possible

8    that you did and you just don't recall?

9         A.   Are you asking me for

10   conversations I had with counsel regarding

11   this whole issue?

12        Q.   I'm asking if it's possible in

13   your mind that you did respond to this e-mail

14   and you just don't recall it?

15        A.   Well, I will say again I will

16   say I don't recall responding to this e-mail.

17        Q.   Do you know the difference

18   between I don't recall and no as answers to

19   questions?

20             MR. DONNER: Let's stop you on

21        this line.  You are now badgering the

22        witness. You said a dozen times today

23      you could say yes, no or I don't recall

24      and when the witness says I don't

25      recall and you try to get her to give a

242

1

2    different answer.  You have to accept

3    that answer whether you believe it or

4    not.  Please let's not badger her.

5    Let's go on to another question.

6         MS. MCGRATH: I heard different

7    things from this witness in response to

8    things.  I see her looking at me and

9    reacting to the question and I see her

10   say I spoke to counsel about it and a

11   number of other things and I'm asking

12   her if it's possible that she signed

13   this and doesn't remember and I don't

14   get an answer to that.  I don't think

15   her answer is I don't recall and I'm

16   entitled to probe that.

17        MR. DONNER: I'm sure if we read

18   through the record we would find a

19   number of times you said you could

20   answer yes no or I don't recall.

21        MS. MCGRATH: That's true.

22        MR. DONNER: It's up to you what

23      you believe or don't believe, but an

24      answer is an answer.  It's not evasive.

25      If you don't believe it, that your

243

1

2      choice, but the answer is specific I

3      don't recall.  You cannot say is it

4      true you don't recall, is the answer

5      really no?

6             MS. MCGRATH: I don't believe

7      that you consider that exchange just

8      now not to be evasive because it

9      clearly was and I have the right to

10      probe the witness as to what she means

11      when she says I don't recall

12      particularly when she qualifies it with

13      the statement that she spoke to counsel

14      about it.

15             MR. DONNER: She answered your

16      question three or four times you asked

17      whether or not she responded?

18             MS. MCGRATH: Are you instructing

19      her not to answer the question?

20             MR. DONNER: Three or four times

21      she responded I don't recall.

22             MS. MCGRATH: Are you instructing

23      her not to answer?

24          MR. DONNER: If you find it

25      evasive or don't believe her you have

244

1

2          your own ways to respond to that.  It's

3          been asked and answered.  I will not

4          allow you to ask and answer the same

5          question for a fifth time.

6                  MS. MCGRATH: I take that as an

7          instruction not to answer?

8                  MR. DONNER: Not to allow you to

9          continue on badgering the witness and

10          I'm telling her if you ask the exact

11          same question again or as close as you

12          have there's no reason to respond a

13          fifth time because you don't believe

14          her.

15                  MS. MCGRATH: I take that as an

16          instruction to the witness not to

17          answer. If I'm wrong I'll try again.

18                  MR. DONNER: In this instance

19          given the set of circumstance I'm

20          instructing her not to answer.

21                  MS. MCGRATH: Okay.  Mark as the

22          next document which is Exhibit 112 a

23        single page document CAP 0019629 from

24        Richard Williams to Barbara Saepia

25        dated Wednesday, September 19, 2007.

245

1

2          Q.   Do you recall receiving this

3     e-mail, Ms. Saepia, or actually there's two of

4     them?

5          A.   I only see one e-mail.

6          Q.   Do you have a single page with

7     two e-mail?

8          A.   I have a single page.

9              MR. DONNER: We have different

10         documents actually.

11             MS. MCGRATH: Let's mark as 113.

12         The document is CAP 0021730.

13         Q.   Have you had a chance to look at

14     these two e-mails?

15         A.   One second.

16         Q.   Do you recall receiving an

17     e-mail from Richard Williams on or about

18     September 19th to you saying Barbara, it has

19     come to my attention that you have not signed

20     and returned the extension agreement extending

21     the Fannie Mae construction phase financing

22     agreement for another six months to April 15,

23    2008.  It's important that you complete this

24    requirement as soon as possible so that this

25    extension will be completed in a timely

246

1

2      fashion rather than at the last minute as was

3      the case for the last extension.  Your

4      immediate attention to this matter will be

5      greatly appreciated.  Do you recall receiving

6      that?

7           A.   I believe I did.

8           Q.   You didn't respond to this

9      either, did you?

10          A.   I don't recall responding to

11     this.

12          Q.   In fact it was a deliberate

13     decision on your part not to respond to this,

14     isn't that so, Ms. Saepia?

15          A.   I don't recall responding to

16     this and I don't appreciate your categorizing.

17          Q.   Was there any reason not to

18     respond to this, Ms. Saepia?

19          A.   I was acting under the advice of

20     counsel.

21          Q.   Is that why you didn't respond

22     to this, Ms. Saepia?

23          A.   I'm saying that I was acting

24     under the advice of counsel.

25          Q.   I'm not asking you to tell me

247

1

2      today what the advice was, but as you sit here

3      today do you remember what that advice was?

4            A.   Yes, I do.

5            Q.   We'll look at the e-mail above

6      that from Richard Williams to Barbara Saepia

7      Friday September 28 2007.  It says Barbara,

8      you have had the extension letter since

9      8/22/07.  It's your responsibility to take

10     care of this matter and I'm not aware of any

11     reason why you haven't done so.  If there is a

12     problem, please let me know and perhaps I can

13     help.  Otherwise, we are depending on you to

14     sign and return the extension letter

15     immediately.  Dick.  Do you recall receiving

16     that?

17           A.   I probably received this e-mail.

18     It was addressed to me.

19           Q.   You don't have any reason to

20     doubt that you received it, do you?

21           A.   No, I don't.

22           Q.   You didn't respond to this

23    e-mail either, did you, Ms. Saepia?

24          A.   My actions were again as I say

25    in accordance to guidance by counsel.

248

1

2          Q.    Whatever the advice was I don't

3    need to hear it, but your action was to not

4    respond to this e-mail; isn't that correct?

5          A.    I don't recall if I responded to

6    this e-mail.

7              MS. MCGRATH: 114.  We got a

8          document you haven't asked a question

9          about? I want to make sure my records

10          reflect what yours do.

11              MS. MCGRATH: I'm losing control

12          of the documents.  Exhibit 114 is a two

13          page document CAP 44026 and 27.  It's a

14          document containing e-mail beginning

15          with one at the top Carissa Lewis dated

16          Wednesday October 3, 2007 and it's

17          addressed among other people to Barbara

18          Saepia.

19          Q.    We go to the bottom of the

20    string you could see Wednesday, August 22nd

21    e-mail Barbara, find attached please find

22    attached the extension letter from Belmont

23     Villas for your execution.  Fannie Mae and

24     Citi have approved the extension and

25     signatures included. I have also sent the

249

1

2    letter to your construction lender for

3    signature. Should you have any questions

4    please feel free to contact me, thank you and

5    it's Carissa Lewis of Citigroup, do you see

6    that?

7         A.   Yes.

8         Q.   Do you recall receiving that

9    e-mail from her and the attachment that it

10    refers to?

11         A.   I probably received this.  It's

12    addressed to me yes.

13         Q.   Then she follows up with you on

14    the September 20th and Barbara as a reminder

15    the Belmont Villas extension letter and fees

16    are due by October 12th.  Your signature is

17    requested on pages 6, 7 and 8.  I have

18    attached the extension letter and invoice for

19    your convenience.  Wire instructions are

20    included in the invoice.  However should you

21    have questions please feel free to contact me.

22    Thank you.  Did you contact Carissa Lewis?

23          A.   I don't believe I contacted

24    Carissa Lewis.

25          Q.   Contact anybody else at Citi

250

1

2    during this period of time?

3        A.   I was not dealing with Citibank.

4        Q.   I don't know if you are drawing

5    a distinction between Citibank and Citi --

6    some other Citi entity but Ms. Lewis is with

7    Citigroup?

8        A.   I meant Citigroup.

9        Q.   When you say you were not

10   dealing with them, she was communicating with

11   you isn't; that that right?

12       A.   She sent me -- Carissa Lewis did

13   send me this e-mail on that date.

14       Q.   She also said if you have any

15   questions please call me, correct?

16       A.   That's what she writes.

17       Q.   It is your belief that you did

18   not call her, is that your testimony?

19           MR. DONNER: Just I think it says

20       if you have any questions please

21       contact me.

22       Q.   Did you contact her?

23        A.   I don't remember contacting

24   Carissa Lewis regarding this e-mail.

25        Q.   Then there's another follow up

251

1

2    October 3, 2007 again from Carissa Lewis again

3    saying the signature pages are due by  October

4    12th.  Should you have any questions please

5    contact me. Thank you.  Did you contact her,

6    Ms. Saepia?

7          A.   I don't remember again

8    contacting Carissa Lewis in reference to her

9    e-mail.

10         Q.   Did you contact Ms. Lewis in

11    some other context?

12         A.   Be specific.

13         Q.   You said I don't remember

14    contacting Carissa Lewis in reference to her

15    e-mail and my question was did you contact her

16    in some other context?

17         A.   At some point in time I did

18    speak with Carissa Lewis.

19         Q.   Was it some time after these

20    e-mails, these September and October e-mails?

21         A.   I believe that was the case.

22         Q.   What did you understand would

23     happen if you didn't sign the agreement, Ms.

24     Saepia?

25          A.   I believe the agreement could

252

1

2    have been signed by a Capmark entity.

3        Q.   If you were wrong about that and

4    the Capmark entity could not make that

5    signature to Fannie Mae's satisfaction what

6    would happen?

7        A.   That was not the case.

8        Q.   Are you certain of that?

9        A.   Ask me am I certain of what?

10       Q.   Are you certain that that was

11   not the case?

12       A.   Are you asking if they got an

13   extension, is that the question?

14       Q.   It's not what I'm asking you.

15   What would have happened if no one signed that

16   extension agreement and what would have

17   happened?

18       A.   If no one signed an extension

19   agreement it would not have gotten the Fannie

20   Mae extension.

21       Q.   Then what would have happened?

22       A.   Fannie Mae would no longer be

23     part of this transaction if no one signed

24     anything.

25          Q.   What does that mean that Fannie

253

1

2   Mae would no longer be part of this

3   transaction?

4        A.   This was a Fannie Mae loan.

5        Q.   Ms. Saepia, did you understand

6   that part of what Fannie Mae's will in this

7   transaction was to provide a credit

8   enhancement agreement?

9        A.   Yes.

10        Q.   And that was what was supporting

11   the bond issue, did you understand that?

12        A.   Yes.

13        Q.   Did you understand that if that

14   credit enhancement was not there there would

15   be a default under the bond?  What did you

16   understand would happen if Fannie Mae did not

17   extend its credit enhancement agreement?

18        A.   I believe the bond would have to

19   be repurchased.

20        Q.   Did you understand yourself to

21   be a guarantor of Capmark's obligation to

22   repurchase the bonds?

23          A.   I believe I was.

24          Q.   So did you take into account in

25     not signing this extension the possibility

254

1

2      that you would have to step up to your

3      guarantee of Capmark's obligation to

4      repurchase the bonds?

5          A.   Say the question again, I missed

6      it.

7              (Record read.)

8          A.   I considered ramifications if I

9      did sign the agreement.

10         Q.   Perhaps we can talk about that

11     in a moment, but my question to you was in

12     making the decision not to sign it did you

13     take into account the possibility that you

14     would have to step up to your guarantee?

15         A.   I discussed those issues with

16     counsel at this time.

17         Q.   You say that you considered the

18     consequences if you did sign it.  Was that

19     your answer a moment ago?

20         A.   Yes.

21         Q.   We had before us an exhibit an

22     earlier Fannie Mae extension, Exhibit 106

23    dated March 15th and I believe we established

24    that the forms are essentially the same, they

25    make the same provision?

255

1

2          A.   That seems to be the case, yes.

3          Q.   So whatever the consequences

4    would be of your signing in August or

5    September or early October the second Fannie

6    Mae extension would be no different would they

7    than the consequences of signing the March

8    15th one?

9          A.   No, I disagree with that

10   assumption.

11         Q.   On what basis?

12         A.   The financial status of the

13   project had changed I believe.

14         Q.   How had it changed?

15         A.   There were more cost over runs

16   by the end of the year.

17         Q.   How else had it changed?

18         A.   That was the major issue, the

19   financial status of the project had changed.

20         Q.   You were aware, were you not,

21   that Capmark was continuing to fund the draw

22   requests for the project?

23          A.    At what point in time are we

24    talking about?

25          Q.    Right up until the end, right up

256

1

2    until October 2007, you knew that, didn't you?

3        A.   I had no idea what was happening

4    in 2007 with draw requests.

5        Q.   You were getting information

6    directly from Racanelli and Fellman, weren't

7    you, as to what was going on with the draw

8    request and funding of the project?

9        A.   Are you talking about in 2007?

10       Q.   Yes.

11       A.   That's not correct.

12       Q.   Is your testimony you did not

13   receive information from Racanelli and Fellman

14   and others that showed that the project was

15   still being funded?

16       A.   I don't recall receiving any

17   information at that point in time.

18       Q.   Did you have any reason to

19   believe that the project was not being funded?

20       A.   I could not tell what was being

21   funded or what was not being funded.  I did

22   not have the financial information which I had

23    requested.

24         Q.   Did you call up and say Capmark,

25    are you still supporting this project, are you

257

1

2    still funding the draw request?

3        A.   Numerous requests had been put

4    into Capmark requesting financial status.  I

5    could not tell what was being funded, what was

6    not being funded.  I was not privy to that.

7        Q.   I'm not asking you whether you

8    knew what was and was not being funded, I'm

9    asking a more general question, Ms. Saepia.

10    You were aware were you not that Capmark was

11    continuing to fund the project as a general

12    matter?

13        A.   I don't know what Capmark was

14    doing regarding the project since I did not

15    have any of the financials which I requested

16    so I could not make a decision based on

17    something I didn't have.

18        Q.   You would have known wouldn't

19    you if Capmark had stopped paying Racanelli

20    and Fellman and others involved in this

21    project, correct?

22            Ms. Saepia, among other things

23      you could go to the project and see people

24      were still working, couldn't you?

25          A.   I often went to the project and

258

1

2    saw no one was working.

3            MR. DONNER: We had a

4        conversation a little bit earlier how

5        late we would go and I said I would not

6        interrupt you mid question. It's 6:15

7        now. I say we go until 6:30 today.

8            MS. MCGRATH: We have to mark her

9        letter.  Obviously I have my position

10        on that and I'll go ahead and truncate

11        out of the practical need to do so but

12        certainly over my objection.  I'm going

13        to mark as 115 an October 8, 2007

14        letter from Barbara Saepia to Richard

15        Williams.

16        Q.   Is that your signature, Ms.

17    Saepia?

18        A.   Yes.

19        Q.   Did you draft this letter?

20        A.   No.

21        Q.   Counsel drafted this letter?

22        A.   Yes.

23          Q.   Why is it addressed to Mr.

24    Williams?

25          A.   He was the asset manager.

259

1

2          Q.    Did you send it to anybody else?

3          A.    I just see this being addressed

4    to Mr. Richard Williams so I don't know if it

5    went to anybody else, but I know it went to

6    Mr. Williams.

7          Q.    You say in this letter it's

8    impossible for me to provide you with the

9    letter you have requested on behalf of Belmont

10    Villas LLC, correct?

11          A.    That's what this letter says.

12          Q.    We can agree or disagree as to

13    whether it was or was not impossible for you

14    but can we agree this is a letter by which you

15    inform Mr. Williams that you are not going to

16    sign the Fannie Mae extension letter?

17          A.    Yes.  This letter is requesting

18    them to be redirected to Protech.

19          Q.    Your answer remains, Ms. Saepia,

20    yes, your answer to the question whether by

21    this letter you informed Mr. Williams that you

22    were not going to sign the Fannie Mae

23    extension letter?

24        A.   I felt that I could not sign

25    this Fannie Mae extension letter.

260

1

2          Q.   The question that I asked you

3     before and the answer that you gave was as

4     follows.  Can we agree that this is a letter

5     by which you informed Mr. Williams that you

6     are not going to sign the Fannie Mae extension

7     letter and you answered yes.  You are not

8     changing that testimony, are you?

9          A.   No, he was being notified that I

10    could not sign this extension letter.

11         Q.   When you before said the answer

12    was yes to my question, it's still yes, isn't

13    it?

14         A.   That I told him that I would not

15    sign the extension letter?

16         Q.   Yes.

17         A.   I believe this is what this

18    letter is saying.  I was not able to sign the

19    extension letter.

20         Q.   Whether you were able to or not

21    is another question.

22         A.   I didn't finish stating my

23    answer.

24         Q.   Go ahead, finish.

25         A.   I lost my sense of what I was

261

1

2    saying.

3        Q.    Whether or not you were able is

4    another issue that we can debate another day,

5    the question I put to you is you were telling

6    Mr. Williams that you were not going to do it,

7    is your answer to that question still yes?

8        A.    Yes.

9            MS. MCGRATH: Mark as Exhibit 116

10           an October 10, 2007 letter from David

11           Sebastian to Barbara Saepia.

12       Q.    I take it you are familiar with

13    this letter, Ms. Saepia?

14       A.    I have seen it, but I have not

15    -- I want to re-read it.

16       Q.    Do you recall receiving this

17    letter?

18       A.    Yes.

19       Q.    Were you surprised when you

20    received this letter?

21       A.    I believe I was.

22       Q.    Is this not a possibility that

23    you contemplated would occur?

24        A.   I would not contemplate

25    receiving a notice of removal, no.

262

1

2          Q.   On the second page in the

3     paragraph that begins on there there's a

4     reference to a number of issues.  Well, let me

5     begin with the sentence among other defaults

6     and violations under the operating agreement

7     it's undisputed that and then there is a

8     paragraph full of points that are made by the

9     letter?

10          A.   Yes.

11          Q.   The first one is that by

12    correspondence dated October 8, 2007 the court

13    has refused to execute the Fannie Mae

14    extension agreement in connection with the

15    mortgage loan commitment or pay the required

16    extension fee in the amount of $45,637.50.

17    Puting aside the issue of the fee, I believe

18    we have just established on the record that in

19    fact it's accurate that you did say in that

20    October 8, 2007 letter that you were not going

21    to sign the Fannie Mae extension agreement?

22          A.   That I could not sign that

23    Fannie Mae extension letter.

24        Q.   We had a lot of questions back

25    and forth about could not and would not, but I

263

1

2    think we established with some clarity on the

3    record whether you could or you couldn't, you

4    were telling Capmark you were not going to do

5    it?

6         A.    There's a difference between

7    could not and would not.  I could not sign

8    that Fannie Mae extension letter.

9         Q.    Do you want me to go back over

10   the record we can, but I believe you said that

11   your letter informed Fannie Mae that you were

12   not going to sign that extension agreement?

13        A.    Informed.

14        Q.    Informed Capmark?

15        A.    Mr. Williams that I felt that I

16   could not sign the -- has excluded me from any

17   duties concerning this project and has

18   withheld from me information concerning this

19   project.  Hence it is impossible for me to

20   provide the letter you requested on behalf of

21   Belmont Villas.  That's what this letter says.

22        Q.    Was it your intent to convey to

23     Capmark that maybe you might under some

24     circumstance sign this letter or was it your

25     intention to say I'm not going to do it?

264

1

2      A.   Under the circumstances being

3   that I have been withheld from information I

4   felt that I could not sign that Fannie Mae

5   letter.

6      Q.   We can go back over the record,

7   but are you changing your prior testimony when

8   you said in answer to my question yes that you

9   were telling -- take that back.  Are you

10   changing your prior testimony with respect to

11   the meaning of your letter to Mr. Williams

12   dated October 8th?

13      A.   I'm saying that perhaps I am

14   changing.  What I meant to say I could not

15   sign the Fannie Mae letter.

16         MS. MCGRATH: I think we now have

17         the witness saying she's changing her

18         testimony at an essential point in this

19         litigation and that alone I would say

20         requires that we have more time with

21         this witness.

22         MR. DONNER: I don't think she

23        changed at all impossible and could not

24        are exact same thing.  I think it's

25        6:30 and nobody is thinking clearly.

265

1

2          The letter says it's impossible and she

3          said could not.  I don't think it's a

4          change at all.

5          Q.   Let me put it this way.  Is it

6     your testimony that your letter was intending

7     to say I cannot so therefore I will not sign

8     this extension letter?

9          A.   My intention was exactly what's

10    in the letter.  Is it possible for me to

11    provide you with a letter that you have

12    requested, I could not sign this letter, the

13    Fannie Mae extension.

14         Q.   Was your letter intended to say

15    I cannot so therefore I will not sign this

16    extension letter?

17         A.   My intention was to say that I

18    could not sign this letter, that was my

19    intention.

20         Q.   Was it your intention to also

21    say and I will not?

22         A.   My intention was to say that I

23    could not sign this letter.

24         Q.   I have a separate question which

25    is was it also your intention to say and I

266

1

2    will not?

3        A.    I said it's impossible for me to

4    sign this letter.

5        Q.    You may have given Mr. Williams

6    reasons as to why it was impossible for you,

7    but it was also the case, Ms. Saepia, that you

8    were telling him therefore I will not sign it?

9        A.    What I'm saying --

10            MR. DONNER: That's not even a

11        question.  You didn't ask a question so

12        there's nothing to answer.

13        Q.    It was also the case, wasn't it,

14    that you were telling Mr. Williams therefore I

15    will not sign it?

16        A.    What I'm telling -- what I told

17    Mr. Williams and I'll repeat it again I said

18    it's impossible for me to provide you with the

19    letter you have requested on behalf of Belmont

20    Villas.  That's what my intention was in this

21    letter.

22        Q.    And therefore you would not sign

23    it, right?

24          A.   Therefore it was impossible for

25    me to sign the letter.

267

1

2          MS. MCGRATH: I really do think

3      we have a problem here because I think

4      we went through this before and we had

5      some clarity on the issue and I think

6      we now do not and unless you are

7      willing to stipulate that those answers

8      that were given earlier are in fact

9      still Ms. Saepia's testimony I think we

10      have to come back to this issue.

11          MR. DONNER: We're not coming

12      back to any issue whatsoever short of a

13      magistrate's order.

14          MS. MCGRATH: That's fine, we'll

15      get the magistrate's order.

16          MR. DONNER: Obviously the

17      magistrate overrules me and you but the

18      letter speaks for itself.  It's a

19      letter.  You spent the last five

20      minutes trying to see if there's some

21      hidden meaning or other meaning and you

22      heard there isn't and you don't like

23          the fact you haven't had the answer you

24          want.

25              MS. MCGRATH: It's a very

268

1

2          straightforward question.

3              MR. DONNER: You mean what does

4          the letter say?

5              MS. MCGRATH: Does the letter say

6          I'm not going to sign it?

7              MR. DONNER: That's very simple,

8          it doesn't say that.  You show me where

9          it does say that.

10             MS. MCGRATH: That's precisely,

11         Mr. Donner, why I asked her was it her

12         intention to convey that message and I

13         believe she said yes so therefore we

14         moved on and now we're going back and I

15         don't know whether she has or she has

16         not changed that answer and I can't

17         tell from what's going on here and

18         that's why I'm saying if she has

19         changed it, we have to come back to it.

20             MR. DONNER: Since it's now 6:30

21         why don't I give you an extra minute to

22         answer that question.  I don't want to

23          leave you in mid question.  Ask the

24          question you think you need to ask,

25          let's get the answer and we can finish.

269

1

2          Q.    Earlier in our exchange I asked

3    you, Ms. Saepia, whether it was your intent to

4    convey by the October 8, 2007 letter the

5    message that you were not going to sign the

6    Fannie Mae extension agreement and you recall

7    that your answer was yes?

8          A.    If that answer was yes then I

9    misspoke.  What I meant to say is that it's

10    impossible to provide the letter.  That was my

11    intention of what I meant to say.

12          MR. DONNER: Are you one question

13          from finishing?  It's 6:30.  It's past

14          6:30.

15          MS. MCGRATH: We have a witness

16          who just retracted a very important

17          piece of testimony and I do not agree I

18          should be cut off from pursuing it

19          further with her.

20          MR. DONNER: You can think you

21          could depose her from now until hell

22          freezes over.  It's now past 6:30.

23          MS. MCGRATH: Fine, we'll bring

24      it up with the magistrate.

25          MR. DONNER: It's 6:30. I think

270

1

2          we will finish now okay.  I tried to --

3                MS. MCGRATH: Are you saying you

4          will not answer any further questions,

5          you are leaving?

6                MR. DONNER: I'm not going to

7          answer any questions but the answer to

8          your question is we discussed this

9          hours ago and we discussed it again at

10          6 and again at 6:15 and I said let's

11          break at 6:30.

12                MS. MCGRATH: I didn't expect the

13          witness to change her testimony on a

14          critical issue.

15                MR. DONNER: And she didn't so

16          that was good that you didn't expect

17          it.

18                MS. MCGRATH: She just did.

19                MR. DONNER: You want to spend

20          the whole day arguing.  We might as

21          well, you go to the magistrate, you

22          explain you don't like the way the

23      witness answered your question and if

24      she says yes, we will be back here and

25      it's that simple.  I think we are

271

1

2    finished.  I know we are finished.

3        MS. MCGRATH: I do have other

4    questions on this document and a follow

5    up to these documents and it is what it

6    is.  If you are leaving you are

7    leaving.

8        MR. DONNER: As per what we

9    discussed and put on the record yes, we

10    are.  We agree to disagree, but we are

11    finished.

12        THE VIDEOGRAPHER: That concludes

13    today's deposition of Barbara M.

14    Saepia.  We're now off the record at

15    approximately 6:34 p.m., June 11, 2009.

16        (Time noted: 6:34 p.m.)

17

18

19

20