UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
CHORD ASSOCIATES LLC, JOPAL ENTERPRISES LLC; and   Case No.: 07 CV 5138 (JFB)
BARBARA M. SAEPIA

            *Plaintiffs,*  **ANSWER TO AMENDED COUNTERCLAIMS AND COUNTERCLAIM**

—against—

PROTECH 2003-D, LLC; AMTAX HOLDINGS 520, LLC; **DEMAND FOR JURY TRIAL**
PROTECH HOLDINGS 128, LLC, CAPMARK AFFORDABLE
EQUITY HOLDINGS INC., CAPMARK FINANCE INC.
(formerly known as GMAC COMMERCIAL MORTGAGE
CORPORATION), its successors and assigns; and CAPMARK
CAPITAL INC. (formerly known as GMAC COMMERCIAL
HOLDING CORPORATION);

            *Defendants,*

-AND-

AMTAX HOLDING 520, LLC; PROTECH 2003-D, LLC and
PROTECH HOLDINGS 128, LLC

            *Counterclaim-Plaintiffs,*

-against-

CHORD ASSOCIATES LLC; BARBARA M. SAEPIA; JOPAL
ENTERPRISES LLC; JOPAL ASSOCIATES INC. AND
ROLAND CONDE

            *Counterclaim-Defendants.*
---------------------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ AUG 13 2009 ★
LONG ISLAND OFFICE

   Counterclaim-Defendant ROLAND CONDE, ("Counterclaim-Defendant Conde") responding to the Amended Counterclaims pro se, alleges as follows as his Answer to the Amended Counterclaims ("Counterclaims"):

1

1. Admits the allegations set forth in paragraphs 135, 140, 141, 143, 144, 146, 147, 149, 150, 163, 164, 166-176, 178-195, 214, 223, 225, 242 and 243.

2. Denies the allegations set forth in paragraphs 133, 134, 136-139, 142, 145, 148, 151-162, 177, 196-213, 215-222, 224, 226, 230, 232-234, 236-240, 244-246, 248-250, 252-255, 257-262, 264-267 and 269-272 of the Counterclaims.

3. Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraphs 165, 227-229 and 268 of the Counterclaim.

4. Repeats and re-alleges the foregoing responses to the allegations set forth in paragraphs 231, 235, 241, 247, 251, 256, 263 and 268 of the Counterclaim.

## AFFIRMATIVE DEFENSES

For defenses, without conceding the burden of proof of any or all of them, Counterclaim-Defendant Conde alleges as follows:

## FIRST DEFENSE

5. Defendants/Counterclaim-Plaintiffs fail to state a claim upon which relief can be granted.

## SECOND DEFENSE

6. Defendants/ Counterclaim-Plaintiffs' claims are barred by the doctrine of unclean hands.

## THIRD DEFENSE

7. Defendants/Counterclaim-Plaintiffs' claims are barred by the doctrine of *Volenti non fit injuria*.

## FOURTH DEFENSE

8. Defendants/Counterclaim-Plaintiffs' claims are barred by the doctrine of collateral estoppel.

**FIFTH DEFENSE**

9. Defendants/Counterclaim-Plaintiffs' claims are barred by the doctrine of laches.

**SIXTH DEFENSE**

10. Defendants/Counterclaim-Plaintiffs, by their conduct, have waived any rights to the relief sought in their Amended Counterclaims.

**SEVENTH DEFENSE**

11. Defendants/Counterclaim-Plaintiffs' claims are barred by the doctrine of *Ex turpi causa*.

**EIGHTH DEFENSE**

12. Defendants/Counterclaim-Plaintiffs' claims are barred by the principle of *Vexatious litigation*.

**NINTH DEFENSE**

13. Defendants/Counterclaim-Plaintiffs' claims are barred as a result of a failure of consideration.

**TENTH DEFENSE**

14. Defendants/Counterclaim-Plaintiffs are not entitled to the relief sought as a result of the lack of privity.

**ELEVENTH DEFENSE**

15. Defendants/Counterclaim-Plaintiffs are not entitled to the relief sought as a result of their failure to mitigate damages.

**TWELVTH DEFENSE**

16. Defendants/Counterclaim-Plaintiffs are not entitled to the relief sought due to the failure to meet a condition precedent.

## NATURE OF ACTION

17.     This action involves Defendants/Counterclaim-Plaintiffs' breaches of certain contractual obligations and promises made to Plaintiffs, said breaches stemming from Defendants/Counterclaim Plaintiffs' inability to comply with the terms and conditions framed by their own counsel, contained within certain agreements known as a *First Amendment to the Amended and Restated Operating Agreement,* and a *First Amendment to Construction Agreement,* ("Amendments") both executed and implemented June 15, 2006 and June 20, 2006, respectively.

18.     The contracts, as amended, unequivocally delegated responsibility and control over all day-to-day construction activities to Defendants/Counterclaim Plaintiffs including "execution and delivery of Construction Contracts, change orders, loan disbursement requisitions and **other documents.**" (Emphasis added).

19.     The Amendments extended the "Completion Date", as defined in the Construction Agreement entered into between Plaintiffs and Defendants/Counterclaim Plaintiffs as of October 1, 2004, to October 31, 2006 and the Construction Budget was adjusted to $35,840,633.35. To further clarify the extent of Defendants/Counterclaim Plaintiffs' authority, the Amended Operating Agreement states in pertinent part: **"Accordingly, in case of any inconsistency between the recommendations, desires or decisions of the Managing Member and the Class A Special Member, as long as this delegation is in effect, <u>the decisions and instructions of the Class A Special Member shall control.</u> The delegation of duties and authority described in this subsection shall terminate on the day after the achievement of the Completion Date".** (Emphasis added).

20.     Lakeside Villas Inc. ("Lakeside"), a single purpose entity for which I was the President, was formed for the purpose of rezoning and developing the present Belmont Villas

4

site ("Project") as a senior residential community. Lakeside acquired title to the site in the late 1990's at which time the site was an unimproved parcel of land zoned for industrial use.

21. Sometime in the summer of the year 2000, I survived a myocardial infarction, which immediately required a re-evaluation of my physical commitment, as well as my plans for the development of the Site. Shortly thereafter, during the fall of that year, I lost my father to pancreatic cancer. My father was an important source of strength and inspiration as well as a significant enabler that helped make possible my successful rehabilitation of more than 1,000 residential units in New York City, starting in the late 1970's. His loss was the final event that convinced me that I was less than fully capable to carry on with my earlier plans and that it would be best to sell the entire interest to the property to Barbara M. Saepia. I agreed to provide any support that my more than 30 years of familiarity with the community and the industry would be of use, in a consulting capacity only, and we proceeded in good faith to cooperate with each other as necessary.

22. After acquiring title on or about January 3, 2001, Ms. Saepia, acting through Jopal Enterprises LLC ("Jopal"), was successful in obtaining a zoning change, converting the property from industrial to Residential Multiple Dwelling use. She also acquired all the Town of Babylon approvals necessary to obtain the required Building Permits. She was likewise successful in obtaining approval of an allocation for an $18,255,000 tax exempt municipal bond from the Suffolk County Industrial Development Agency in 2003. With this municipal bond allocation in hand, Ms. Saepia applied for, and was granted, an additional $11,170,000 in automatic Affordable Housing Credits reserved by the New York State Department of Housing and Community Renewal for the benefit of Jopal. As is customary with these types of transactions,

5

on or approximately December 30, 2003, Ms. Saepia transferred title to the property to Belmont Villas LLC, which was wholly owned by her.

23. Defendants/Counterclaim-Plaintiffs had commenced their "due diligence" process at the request of Ms. Saepia sometime around August 2003. They proceeded to investigate all of the aspects of the Project, including, but not limited to: environmental, engineering, architectural, permitting as well as the management, federal program compliance and personal and professional experience of Ms. Saepia. Their due diligence investigation continued for a period of approximately 15 months engaging personnel from GMACCM (n.k.a. Capmark Finance), Paramount Financial Group (n.k.a. Capmark Affordable) and third party providers GCI and IVI respectively hired by Defendants/Counterclaim Plaintiffs to assist in the investigation and due diligence. The investigation resulted in various reports, continuing evaluations and risk assessments that rated the Project and Ms. Saepia "above average". Only after Defendants/Counterclaim Plaintiffs' breach of their June, 2006 Amendments, which by Defendants/Counterclaim Plaintiffs' own admission, with which they failed to comply, did the name calling and assertions of negligence by Defendants/Counterclaim-Plaintiffs find their way into letters and monitoring reports. Defendants/Counterclaim-Plaintiffs' inability to comply with their contractual obligations had impaired their ability to acknowledge that it was their breach of contract, effective November 1, 2006, that was at the center of the chaos that followed.

24. Defendants/Counterclaim Plaintiffs interfered with Plaintiffs' good faith efforts to comply with the various County, State and Federal Agencies programs reporting and filing requirements, by withholding material information concerning financial and construction monitoring of the Project for a period covering the end of year 2006, through the end of the first three quarters of 2007. They chose instead to mischaracterize Plaintiff Saepia's actions so as to

discredit her in the eyes of the Town of Babylon officials, the Suffolk County Industrial Development Agency, the New York State Department of Housing and Community Renewal, various contractors, subcontractors, third party professionals and utilities companies, some of whom had worked with Saepia for more than seven years.

25. Defendants/Counterclaim-Plaintiffs subsequently, during the period between August 9, 2007 and October 8, 2007, pressured Plaintiffs into making certain affirmative representations and acknowledgements to Fannie Mae, in letter form, which included statements of Plaintiffs' acceptance of liability, so as to obtain an extension of the Fannie Mae financing for the Project. Defendants/Counterclaim-Plaintiffs finally, and only in response to Discovery Requests, provided the documents that Plaintiffs, the Project CPA and Bruce H. Kaplan, Esq. had requested numerous times, and had never been provided to Plaintiffs. These documents, identified as "Draws", and "Construction Monitoring Reports" and specifically Draws #25 through Draw #28, contained statements and admissions that revealed, among numerous other concealed events, a budget overage in excess of $4 million, as of September 19, 2007, or more than 3 weeks before the wrongful dismissal of Plaintiffs, without proper notice and in retaliation for Plaintiffs failing to make uninformed admissions and representations. When confronted with these documents at depositions, and when asked to elaborate why nobody in Defendants/Counterclaim Plaintiffs' chain of command bothered to verify the truth or falsity of any of the accusations offered as reasons for Plaintiffs wrongful dismissal, several of the Defendants/Counterclaim Plaintiffs' representatives with the most direct involvement in the Project claimed a most pathetic form of "deliberate ignorance", all insisting that "someone else" had provided the information to Plaintiffs.

## FACTUAL ALLEGATIONS

26. There were no honest and straightforward reasons for the wrongful dismissal of Plaintiffs, and no defense or justification for the Defendants/Counterclaim-Plaintiffs' breach of contract. By Defendants/Counterclaim Plaintiffs' own admissions, they failed to complete the Project on time or within budget, as contractually agreed in documents drafted by their own attorney, Andrew Kramer. Defendants/Counterclaim-Plaintiffs unveiled a strategy of highlighting certain aspects of Counterclaim-Defendant Conde's personal history, and in this manner, establish a framework within which Plaintiffs could be tarnished by their allegations of "guilt by association".

27. Indeed, at the early stages of this litigation, more than 16 months prior to Conde's being joined as Counterclaim-Defendant, at Document #21, Attorney McGrath's *Memorandum of Law in Opposition to Plaintiffs Order to Show Cause*, docketed 3/24/2008, contains the following language at a portion of page 6: "...**Roland Conde, who, due to past criminal problems, is allegedly barred from tax credit transactions such as this Project.**" (Emphasis added).

28. Moreover, at Document # 22, *Declaration of Phil Pavlovicz in Opposition to Plaintiffs Order to Show Cause,* contains the following statement, in a part of paragraph 20 "...**Roland Conde, a former real estate developer who has been banned from tax credit problems due to criminal problems in the past**" (Emphasis added)

29. More recently, at Document # 101, Attorney McGrath's *Answer to the First Amended Complaint and Amended Counterclaims,* docketed 5/21/2009, contains the following language in a portion of paragraph # 133: "... **Conde, who was effectively barred from low income housing projects such as this Project due to his past indictment.**" (Emphasis added)

8

30. Again, at Document # 101, and in an effort to provide support for her fictional and groundless allegations against Plaintiffs, and in an effort to bring a cloud over Counterclaim Defendant Conde's fitness and honesty, Attorney McGrath, at paragraph # 152, states as follows **[Conde] "...lost his business in the early 1990's when he was <u>indicted for overstating the value of properties in order to obtain mortgages from Freddie Mac</u>".** (Emphasis added)

31. Having not dwelled enough on the issue, at paragraph #153 of the same Document # 101, Attorney McGrath reiterates: **"Though Conde was eventually acquitted of the charges relating to his indictment, upon information and belief, <u>he lost his ability to apply for the tax credits necessary to carry out the development of low income housing businesses.</u>"** (Emphasis added)

32. Defendants/Counterclaim-Plaintiffs, now comfortable with their defamatory description of Counterclaim- Defendant Conde, recklessly and with no regard for the truth, set forth a *raconteur's* tale more suitable to their needs than the truth itself. For example, completely disregarding the definition of terms contained in closing documents drafted by their own attorneys, referencing and acknowledging a Third Note owed to Plaintiffs for unpaid consideration involving the payment for the land and other reimbursable payments, Defendant/Counterclaim-Plaintiffs suddenly and without cause or justification, decided to re-characterize this debt which they owed to Plaintiffs, as a debt owed by Plaintiffs to them.

33. In an apparent effort to justify their claim that $3 million in funds were "diverted" from the Project, Defendants make the preposterous allegation that because title to the Site had been vested in Lakeside, this constitutes some kind of "fraud".

34. The mandate to Plaintiffs, which all parties agreed to at the outset prior to the October 2004 closing, was to credit the land with the agreed upon value of $4,250,000.00 and for

9

Plaintiffs to deliver a lien free title to the site which, along with other reimbursable items advanced by Plaintiffs, caused the need for a Deferred Developer Fee and the Third Note referenced above. Plaintiffs performed the mandate and agreed to these deferments in order to make the Project's budget be attainable. At no time was there or should there have been restrictions placed upon how Plaintiffs disbursed or directed disbursements to be made from actual proceeds received at the October 2004 closing. Defendants/Counterclaim-Plaintiffs have never fully reimbursed Plaintiffs and have disregarded Plaintiffs' reliance on their promises that such reimbursements would be coming at a future date.

35. In exchange for Plaintiffs' cooperation, Defendants/Counterclaim-Plaintiffs, from the beginning, have conducted themselves in a manner so as to sabotage Plaintiffs' equity and other contractual interests for their own gain, and to unjustly enrich themselves at Plaintiffs' expense. Defendants/Counterclaim-Plaintiffs breached the Amendments to the contract agreements, which they promulgated themselves, by failing to deliver on promises they made to complete the Project on schedule and allowing budget overruns that occurred entirely during their management and control over construction activities and decisions.

36. Now, as is often the case with abusers, they blame the victim. To further abuse the truth, Defendants/Counterclaim-Plaintiffs seek to extend their vexatious litigation by embarking upon the pursuit of various irrelevant invasions upon the privacy of third parties, and their dealings in unrelated transactions dating as far back as twenty years just because they involved recently joined Counterclaim-Defendant Conde, who according to Defendants/Counterclaim Plaintiffs' counsel "past criminal problems have barred him from participating in these types of Projects."

10

37. After trying, unsuccessfully, to buttress their claim of fraud against Plaintiffs by attempting to extract statements or admissions from various deposed witnesses that Counterclaim-Defendant Conde was somehow involved in the ownership of the Project, or that he in any way represented, or was represented as such, Defendants/Counterclaim-Plaintiffs still insist on promulgating their libelous and defamatory theories.

38. Defendants/Counterclaim Plaintiffs recklessly accuse Plaintiffs of fraud, knowing that they could not substantiate the elements to support such a claim. For example, Defendants/Counterclaim Plaintiffs cannot show the materiality of either Roland Conde or Richard Saepia's identity being influential in their decision to approve the Project, nor the consequent or proximate damages they claim to have suffered when, by their own admissions, expressed in various documents and discovery revelations, the Project's sources and uses were "in balance" and the budget was sufficient to achieve construction completion.

39. Finally, after succeeding on their motion to join Counterclaim-Defendant Conde, Defendants/Counterclaim-Plaintiffs now have to answer for their repeated libelous and defamatory assaults upon Conde and Plaintiffs in this litigation. First and foremost, I am informed that a "criminal past" is something that follows a person or entity that has been found guilty of a crime, after due process, and trial.

40. Thus, every reference to my "criminal past" or "criminal problems in the past" amounts to nothing more than false inferences deliberately made for the only purpose of casting a false light upon the dignity and integrity of Roland Conde, and creating the false impression that there must somehow be "guilt by association" attaching to anyone and everyone who engaged in business or personal transactions with me as far back as twenty-plus years ago.

11

41. In fact, past experiences have taught me that, in this judicial system, a person or entity is entitled to the presumption of innocence that is famously coined in the term commonly used: "Innocent until proven guilty." Defendants and their counsel are attempting to stamp their own term, and that is : "Guilty after a "not guilty" judgment has been adjudicated. They do not have this right.

**42.** Further, Defendants and Attorney McGrath have repeatedly stated that "my indictment" and "my past criminal problems "(see paragraphs 27 through 31 of this Answer), have resulted in my being : "(i) **banned, (ii) effectively barred, (iii)allegedly barred, and (iv)** my having **lost [his] ability to apply for the tax credits necessary to carry out the development of low income housing businesses."** All such allegations are **false.**

43. It is simply not true that at any time during either of Plaintiff Saepia's applications and successful approval of the low income tax credit awards to both of her Projects, that I was either banned, barred from, or deemed unable to apply for participation in the program. Indeed, as soon as I was made aware of these defamatory statements and claims made by Defendants/Counterclaim Plaintiffs and Attorney McGrath, I endeavored to have inquiries made to a New York State Housing and Community Manager (NYSDHCR) who confirmed that only persons who have been **convicted of a felony** are banned, or barred, or effectively unable to participate. I knew this to be the case, but secured this confirmation anticipating that Attorney McGrath would challenge it, as she has previously done when she challenged my Doctor's medical opinion regarding my exposure to stress during a period of increased medication and the side effects impairing my ability to aptly account for my responses.

12

44.     I submit this answer *pro se*, because I lack the economic ability to pay for professional legal representation and my attempts to seek *pro bono* help have so far not been successful. I do not want to default by failing to submit a timely Answer.

45.     I apologize to the Court and all participating counsel, for any failings or shortcomings that may be contained in this Answer, however, I must respectfully protest Attorney McGrath's misrepresentations, unwarranted vilification and libelous assault upon my dignity. As a member of a large and powerful law firm, or two, she either knew, or should have known that her allegations against me were false. There must be some ethical or procedural bar to an Attorney's deliberate mischaracterization of a party, and for the most part, a non-party, since I have been joined only recently. If this is the case and sanctions are appropriate, I request that such sanctions be imposed upon Attorney McGrath.

## COUNTERCLAIMS AGAINST DEFENDANTS / COUNTERCLAIM PLAINTIFFS
## FIRST CLAIM FOR RELIEF
## (FOR DEFAMATION)

46.     Counterclaim-Defendant Roland Conde repeats and realleges paragraphs 1 through 45 as if fully set forth herein.

47.     Defendants, knowing them to be false, communicated and disseminated statements, expressly stating them as factual, in order to give Conde a negative image, and to further their frivolous claims against Plaintiffs by suggesting "guilt by association" in their past and present business and personal relationships with Counterclaim-Defendant Conde.

48.     Defendants/Counterclaim Plaintiffs' dissemination of such calumnies caused Conde's loss of status and eventual dismissal from a previously agreed upon development and consulting agreement for the construction of several hundred low income housing units in Suffolk County, all resulting in economic and personal damage to Conde.

49. Upon information and belief, on or about January 2008, after verbally agreeing to enlist Counterclaim-Defendant Conde and attorney Bruce H Kaplan to provide consulting and development assistance aimed at the successful construction of an affordable rental community upon land owned by the Rechler Group through their organization identified as "R Squared", Counterclaim-Defendant Conde suggested to Gregg Rechler, a principal, that Belmont Villas could be purchased as a possible resolution to the ongoing litigation before this Court. Representatives of the Rechler Group visited the Site with a broker and spoke with Phil Pavlovicz, a representative for Defendants/Counterclaim-Plaintiffs upon whose orders Conde and Kaplan had been banned from the premises since approximately October 12, 2007. The following day, and using almost the exact language that Pavlovicz used in his "Declaration" (Document 22 docketed 3-24-2008) the Rechler Group informed Conde and Kaplan that, due to Conde's "**criminal past**" and his "concealment of a ban that "**effectively barred [him] from participation in the tax credit program**", they would not proceed with the previously agreed terms. Further, they required us to inform Jim Morgo, Commissioner for Affordable Housing, the Suffolk County Industrial Development Agency and the Long Island Housing Partnership, all entities and persons that we had contacted in connection with the Rechler's planned rental development, that we were **not authorized to any longer represent that we were in any way connected to the Rechler Group.** Defendants had no right to defame, embarrass or cause Conde to be judged under the false light of a "**criminal past**" or advancing the false allegation that Conde was **"barred" as a result**, as they have paraded the issue repeatedly before this Court.

50. By virtue of the foregoing, Defendants are liable for damages in an amount to be determined at trial, but in no event less than $1,300,000.00 in development and consulting fees.

14

## SECOND CLAIM FOR RELIEF

## (FOR FALSE LIGHT INVASION OF PRIVACY)

51.  Counterclaim-Defendant Roland Conde repeats and realleges paragraphs 1 through 50 hereof as if fully set forth herein.

52.  Counterclaim-Defendant Conde, found not guilty in the 1992 criminal proceeding frequently alluded to in this case by Defendants/Counterclaim-Plaintiffs and their counsel, was entitled to a reasonable expectation of freedom and privacy to pursue his personal and business relationships. The repeatedly false and highly offensive portrayal of Conde as someone whose "past criminal problems" have "allegedly barred" or "effectively barred" or "banned" him from participating in the low income housing projects, effectively intruded into his privacy and severely damaged his credibility and stature within the development community of Suffolk County, and beyond.

53.  By virtue of the foregoing Counterclaim-Defendant Conde is entitled to compensation from Defendants/Counterclaim-Plaintiffs for the damages caused to his dignity and reputation, in an amount to be determined at trial, but not less than $4 million.

## VEXATIOUS LITIGATION

54.  Counterclaim-Defendant Conde repeats and realleges paragraphs 1 through 53 as if fully set forth herein.

55.  Defendants/Counterclaim Plaintiffs, through their actions, have pursued several private personal and business relationships of Counterclaim/Defendant Conde, and pursued various inquiries into his business activities as far back as 22 years, dealing with transactions completely irrelevant to the Project which is the subject of the current litigation, all in an effort to harass, frustrate and eventually subdue, Plaintiffs and Counterclaim-Defendant Conde. The

15

chilling effect of this frivolous pursuit into Conde's private and business relationships is tangible and severe.

56. By virtue of the foregoing, Defendants/Counterclaim Plaintiffs are liable in an amount to be determined at trial, but in no event less than the costs associated with their vexatious misconduct.

## JURY DEMAND

57. Counterclaim Defendant Conde hereby demands a jury trial for all claims and Counterclaims.

WHEREFORE, Counterclaim-Defendant Conde demands judgment as follows:

1. On the first claim for relief for Defamation in the amount of $1,300,000.
2. On the second claim for relief for invasion of privacy in the amount of no less than $4,000,000.
3. On the third claim for vexatious litigation in an amount to be determined at trial but no less than the costs associated with their vexatious misconduct.
4. Such other relief as the Court deems just and proper.

Dated: August 12, 2009

By: _____

Roland Conde, *pro se*
*Counterclaim-Defendant*