**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
CHORD ASSOCIATES LLC, JOPAL
ENTERPRISES LLC; and BARBARA M.
SAEPIA,

                        Plaintiffs,

            -against-

PROTECH 2003-D, LLC, AMTAX HOLDINGS
520, LLC; PROTECH HOLDINGS 128, LLC;
CAPMARK AFFORDABLE EQUITY HOLDINGS
INC; CAPMARK FINANCE INC. (formerly known
as GMAC COMMERCIAL MORTGAGE
CORPORATION), its successors and assigns;
CAPMARK CAPITAL INC. (formerly known
as GMAC COMMERCIAL HOLDING
CORPORATION),

                      Defendants.
------------------------------------------------------------X

AMTAX HOLDINGS 520, LLC, PROTECH
2003-D, LLC, CAPMARK FINANCE, INC.,
CAPMARK CAPITAL, INC. and PROTECH
HOLDINGS 128, LLC,

                 Counterclaim-Plaintiffs

             - against -

CHORD ASSOCIATES LLC, BARBARA M.
SAEPIA, JOPAL ENTERPRISES LLC, JOPAL
ASSOCIATES, INC., and ROLAND CONDE,

                Counterclaim-Defendants.
------------------------------------------------------------X

                       **MEMORANDUM**
                         **AND ORDER**

                       07-5138  (JFB) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

       This case arises out of Defendants' assumption of duties as developers of the affordable

housing project known as Belmont Villas, a planned retirement community.  Compl. ¶¶ 15, 17.

Plaintiff Jopal Enterprises ("Jopal") purchased an 11 acre parcel of land in February 2001 to develop this retirement community in West Babylon, New York. *Id*., ¶ 17. In October 2003, Belmont Villas LLC was formed, consisting of two members - - Plaintiff Chord Associates LLC ("Chord") as the Managing Member and Plaintiff Barbara Saepia ("Saepia") as the second member. Saepia was and remains the sole member of Chord. Id., ¶ 19. In 2003, Jopal began discussions with GMAC (later known as Capmark Finance Inc. ("Capmark")), along with other financial institutions, to underwrite and syndicate the project's financing. *Id.*, ¶ 24. In December 2003, Jopal transferred title to the project to Belmont Villas. *Id.*, ¶ 20. The project was financed in part through bonds issued by the Suffolk County Industrial Development Agency ("IDA") and the sale of Low Income Housing Tax Credits. *Id.*, ¶¶ 21, 23. Ultimately, Capmark arranged for permanent financing with Fannie Mae. Id., ¶ 25.

Multiple problems ensued with the construction of the project, including but not limited to environmental law violations. Those problems generated this litigation in which Plaintiffs seek damages for alleged (1) breach of contract by Capmark and its Affiliates for purportedly submitting false information to the Town of Babylon, failing to provide financial information to Plaintiffs, and failing to achieve project completion in a timely manner and at the agreed-upon cost; (2) negligence based on Defendants' breach of their duty to Plaintiffs under the Construction Agreement Amendment to achieve completion by October 31, 2006 at a specified cost; (3) breach of the obligation of good faith and fair dealing under New York law based on Defendants' alleged frustration of Plaintiffs' essential purpose in entering into the various agreements; (4) breach of fiduciary duty based upon Defendants' assumption of the duties and responsibilities of Managing Member of Belmont; (5) Defendants' exercise of improper control,

2

upon execution of the Amendments, resulting in unjustified cost overruns and loss of income; (6) fraudulent misrepresentations by Capmark and its Affiliates concerning financial and environmental issues in the sworn Owner's Statements and the wrongful removal of Chord as Managing Member; (7) Defendants' transmittals of certain emails causing damage to Plaintiffs' reputations in the Housing Tax Credit, Town, Government and local communities; (8) tortious interference with contracts; and (9) conflicts of interest created by Defendant Capmark and its Affiliates.

On November 5, 2009, counsel for all of the corporate Defendants in this action notified the Court [DE 148] that Defendants Capmark Affordable Equity Holdings Inc., Capmark Finance Inc. and Capmark Capital Inc. filed voluntary Chapter 11 petitions under the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  Proof of the bankruptcy filings was attached to Defendants' motion.  As Defendants' counsel notes, this action, as against these three Defendants, is now automatically stayed, pursuant to 11 U.S.C. § 362(a).

However, Defendants' counsel seeks a stay of this *entire* litigation based upon the bankruptcy filings.  According to counsel, Defendants Protech Holdings 128, LLC, Amtax Holding 520, LLC and Protech Holdings 128 LLC are each special-purpose entities and are wholly owned subsidiaries of Capmark Affordable Equity Holdings, Inc.  Plaintiffs oppose the motion on the grounds that the "gravamen of plaintiffs' complaint is against non-debtors Defendants Amtax Holdings 520, LLC, Protech 2003-D, LLC and Protech Holdings 128, LLC ('Membership Entities'), which have various membership roles with the apartment complex at issue, Belmont Villas LLC ('Project'), which also is not a debtor."  DE 149 at 1.  Although

3

Plaintiffs do not oppose a stay as to the Capmark entities which filed bankruptcy petitions, they do object to a stay of ***all*** pending proceedings.   Plaintiffs also note that the Counterclaim is asserted by the Membership Entities, not the Capmark Defendants who filed for bankruptcy, and so the counterclaim is clearly not stayed.  DE 149 at 2.  Based upon the parties' submissions, the positions proffered at oral argument, and the applicable case law, Defendants' motion is determined as set forth below.

## I.   PROCEDURAL STATUS

Following Defendants' letter motion and Plaintiffs' opposition, Defendants submitted a letter request to Judge Bianco seeking a telephone conference to address the request for this action to be taken off the calendar and held in a suspense mode due to the bankruptcy filings. *See* DE 150.   Newly added Counterclaim-Defendant Roland Conde, who is proceeding *pro se* in this matter, filed a letter objecting to any stay, stating that "because a debtor's counterclaims are not covered by the automatic stay, there exists no stay requiring the suspension of my discovery" and that given his current physical and financial circumstances, if a stay were to be granted he "will be prejudiced more so than any party to this litigation." See DE 151.   After speaking with the parties during a phone conference on November 30, 2009, Judge Bianco directed that the motion to stay was referred/assigned  to me based upon my familiarity with the case at that juncture.  *See* Electronic Order of November 30, 2009.  I scheduled oral argument of the motion for December 17, 2009.

At the conclusion of the hearing, I gave the parties until December 31, 2009 to file an additional submission to address the issues I raised at the hearing which had not been fully answered by the parties.   Defendants filed three pages of supplemental briefing, with eight

4

confidential exhibits filed under seal.  *See* DE 157.  Plaintiffs did not file any supplemental

briefing.  Third-party Defendant Roland Conde submitted a letter dated December 30, 2009

[DE 159].  Several weeks later, Mr. Conde filed a response [DE 160] to Defendants'

December 31, 2009 filing, without obtaining any permission from the Court to make such a

filing.  Consequently, the Court will not consider DE 160.  In light of that determination, the

Court also denies Defendants' motion to supplement its prior submission [DE 161] to address

Mr. Conde's January 15, 2010 reply.

      With the final submissions having been made, the Court now turns to analyzing

Defendants' motion for a discretionary stay, or, in the alternative, for a ruling that the § 362

automatic stay currently in place for the three Capmark Defendants encompasses the wholly

owned subsidiaries (*i.e.*, the Membership Entities) on the grounds that these non-debtor

Defendants are "inextricably intertwined" with the Capmark Defendants as applied to this case.

## II.   <u>APPLICABLE LAW</u>

      The automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362(a)(1), states that

> [e]xcept as provided in subsection (b) of this section, a petition filed
> under section 301, 302, or 303 of this title, or an application filed under
> section 5(a)(3) of the Securities Investor Protection Act of 1970, operates
> as a stay, applicable to all entities, of-(1) the commencement or
> continuation, including the issuance or employment of process, of a
> judicial, administrative, or other action or proceeding against the debtor
> that was or could have been commenced before the commencement of the
> case under this title, or to recover a claim against the debtor that arose
> before the commencement of the case under this title . . .  (3) any act to
> obtain possession of property of the estate or of property from the estate
> or to exercise control over property of the estate. . . .

"It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass

non-bankrupt co-defendants."  *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65

(2d Cir. 1986); *Olick v. Parker & Parsley Petroleum Co.,* 145 F.3d 513, 516 (2d Cir. 1998);

*Koolik v. Markowitz*, 40 F.3d 567 (2d Cir.1994); *Dorsett-Felicelli, Inc. v. County of Clinton*, Civ.

No. 1:04-CV-1141, 2009 WL 1652183, at * 3 (N.D.N.Y. June 5, 2009); *Kilmer v. Flocar, Inc.*,

212 F.R.D. 66, 73 (N.D.N.Y.2002).  "Chapter 11, unlike Chapter 13, contains no provision to

protect non-debtors who are jointly liable on a debt with the debtor." *Teachers Ins. & Annunity*

*Ass'n of Am.,* 803 F.2d at 65.

By its terms, section 362 applies only to debtors, property of the debtor, or property of the

estate, and does not apply to stay proceedings against non-debtors.  *In re Calpine Corp*., 365 B.R.

401, 408 (S.D.N.Y. 2007).  However, courts have extended the automatic stay to non-bankrupt

co-defendants in "unusual circumstances."  One of the earliest decisions reflecting this exception

is *A. H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986) where the court granted a

preliminary injunction restraining the prosecution of a products liability case against the debtor's

co-defendants.  *Id*.at 1016.  In doing so, the Fourth Circuit provided some guidance as to the

parameters of such "unusual circumstances":

> This "unusual situation," it would seem, arises when there is such identity
> between the debtor and the third-party defendant that the debtor may be
> said to be the real party defendant and that a judgment against the third-
> party defendant will in effect be a judgment or finding against the debtor.
> An illustration of such a situation would be a suit against a third-party
> who is entitled to absolute indemnity by the debtor on account of any
> judgment that might result against them in the case. To refuse application
> of the statutory stay in that case would defeat the very purpose and intent
> of the statute.

Id. at 999.  The Second Circuit provided some further clarification in *Queenie Ltd. v. Nygard*

*Int'l*, 321 F.3d 282 (2d Cir. 2003):

6

> The automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate.  Examples are a claim to establish an obligation of which the debtor is a guarantor (citation omitted), a claim against the debtor's insurer (citation omitted), and actions where "there is such identity between the debtor and a third party defendant that the debtor may be said to be the real party defendant. . . " (citation omitted).

*Queenie*, 321 F.3d at 287-288 (quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d 994,  999 (4th Cir. 1986).  With these principles in mind, the Court now turns to the facts of the instant case.

## III.   DISCUSSION

It should be noted at the outset that none of the parties contest the fact that Defendants Capmark Affordable Equity Holdings Inc., Capmark Finance Inc. and Capmark Capital Inc. come within the automatic stay provisions of 11 U. S. C. § 362 (a).  The dispute arises over the treatment of the non-filing defendant entities. In addition, the Court further notes that the Defendants have brought no information to the Court's attention showing that the Delaware Bankruptcy Court also stayed all actions as to the wholly owned subsidiaries who are Defendants in this case.  It seems clear, then, that the § 362(a) stay does not encompass the Membership Entities, the wholly owned subsidiaries which did not file for Chapter 11 protection.

According to the Defendants, the three remaining corporate entities (*i.e.*, the Membership Entities) are "special-purpose entities" and Plaintiffs' claims asserted against them in the Complaint are "not differentiated from the claims against the defendants who filed bankruptcy petitions. " DE 148 at 1.  Moreover, Defendants maintain that the witnesses involved in this action are employees of the debtor Defendants who have filed for bankruptcy and that the resources needed to defend the actions belong to those Defendants.  Accordingly, Defendants

maintain, the claims against the Membership Entities impact and are "inextricably interwoven" with the bankruptcy estates of the Defendants who have filed petitions. *Id*. Plaintiffs dispute this assertion and note the following:

> Much of the financial press about the Capmark bankruptcy filing makes specific reference to the fact that "Capmark Bank," a Utah bank, is not part of the filing because Capmark's principals desire to maintain its untarnished viability. Similarly, the filing of a bankruptcy petition by one or more of the Membership Entities would constitute an event of default under many of the Loan Documents, thus further jeopardizing the Project's tax-exempt bond financing and Low-Income Housing Tax Credits ("LIHC"), and thus such entities appear to not be covered by the automatic stay.
>
> Further, because the Project was placed in service by Defendants in 2009, the 15-year regulatory period will commence January 1, 2010, and the LIHC, which have been allocated to plaintiff Jopal Enterprises LLC and were to have been Amtax Holding 520 LLC's to syndicate, will start to "burn" unused at an annual rate of $1,109,687 (together with anticipated additional credits to be allocated in connection with extra Project costs). Accordingly, without a fast resolution of the Action, no less than $92,473.92 per month ($1,109,687/12) will be wasted beginning in January.
>
> Moreover, the action by Counterclaim-Plaintiff's Amtax Holdings 520, LLC, ProTech 2003-D, LLC and Protech Holdings 128, LLC, and which action does not include the Capmark Debtors as Counterclaim-Plaintiffs, against Counterclaim-Defendants Chord Associates LLC, Barbara M. Saepia, Jopal Enterprises LLC, Jopal Associates Inc. and Roland Conde, is not stayed.

DE 149 at 1-2.

Likewise, Counteclaim-Defendant, Roland Conde, argues that the non-debtor Defendants are *not* "inextricably interwoven" with the filing debtors. DE 159. Conde asserts that Defendants are taking a position in moving for a stay that is entirely inconsistent with the position taken earlier in this litigation when counsel argued it was Defendants' intention that

there be no merger of identity of the entities.  *Id*.

### A.  <u>Scope of the Automatic Stay</u>

Defendants rely on a number of cases to support their position that a stay should be in place in this action.  The Court finds that Defendants' reliance on *In re 48th Street Steakhouse, Inc.*, 835 F.2d 427 (2d Cir. 1987), however, is misplaced.  In that case, the Second Circuit was dealing with a very different factual scenario.  Specifically, the bankruptcy court in *48th Street* found that where the landlord corporation sent a lease termination to the assignee of 48th Street's lease, such action was a violation of  48th Street's right to an automatic stay under § 362 of the Bankruptcy Code.  The landlord had consented to the assignment of the lease from 48th Street to I.S.H. Liquidating Corporation in order to finance 48th Street's purchase of the restaurant existing at the premises.  *Id*. at 428.  One section of the lease provided that the landlord would consent to the future reassignment of the lease back from I.S.H. to  48th Street "whenever requested by the Assignee and Assignor."  *Id*. at 429.  The lease was to be reassigned as soon as 48th Street had satisfied all its financial obligations to the corporation which owned the restaurant.

After the assignment of the lease from 48th Street to I.S.H., I.S.H. then sublet the premises to 48th Street, with the landlord's consent.  *Id*.   Eight years later, 48th Street and its parent corporation filed Chapter 11 bankruptcy petitions.  *Id*.  A month later, the landlord served I.S.H. with notice of default, with five days to pay arrears.  Once 48th Street was served with a copy of the notice, it immediately commenced an adversary proceeding seeking an injunction against the landlord.  *Id*.  A preliminary injunction was granted by the Bankruptcy Court which served to stay the effect of the lease termination notice.  Eventually, the Bankruptcy Court granted 48th Street's motion for summary judgment, finding that the default and termination notices issued by

the landlord were ineffective because they violated the automatic stay provisions of Section 362 of the Code. *In re 48th Street Steakhouse, Inc.*, 61 B.R. 182, 189 (Bankr. S.D.N.Y. 1986). The Bankruptcy Court distinguished this situation from those of other non-debtor co-defendants where the debtor's property was not in jeopardy. *Id.* In the circumstances then before him, the bankruptcy judge noted that "[b]ut here the peril to the debtor is manifest for it is axiomatic that under New York law, when a prime lease falls, so does the sublease." *Id.* (citing 34 N.Y. Jur., *Landlord and Tenant* § 270 (1964). Those are not the circumstances facing this Court. Rather, the claims here are based on contracts involving the building and financing of Belmont Villas. There is no danger here of a party losing its leasehold interest in property, nor is the Court faced with the type of emergency circumstances apparent in *48th Street*.

Apparently, the other activity which prompted Defendants to seek a stay in the instant litigation was the service of certain subpoenas upon non-parties by newly added Counterclaim-Defendant, Roland Conde. DE 148 at 2. According to Defendants, this non-party discovery "also affects and is inextricably intertwined with the bankruptcy estates," although Defendants do not say how or provide any additional detail in their letter motion. Nothing in the letter motion itself establishes how the Defendants are so "inextricably intertwined" that any discovery conducted by Plaintiffs or the non-debtor entities would have an immediate and harmful impact on the Defendant debtors. Consequently, the Court attempted to have the parties address this issue at oral argument of the motion. At the December 17, 2009 hearing, the Defendants proffered the following facts and arguments in support of a stay:

10

- A series of Capmark entities filed for bankruptcy protection on October 25, 2009; that estate has over $1 billion in assets and is one of the largest real estate financing companies in the country.  *See* Transcript of December 17, 2009 Oral Argument, at 3.[1]

- Belmont Villas, LLC is the owner of the Belmont Villas project that is the subject of this litigation.  Three of the Capmark subsidiaries (Amtax Holdings, Protech Holdings, Protech 2003-D) are special-purpose entities which exist solely for purposes of taking memberships in LLCs that are formed in connection with projects all across the country.   These special-purpose entities do not have documents, witnesses, employees, or assets. Tr. at 3-4.

- Capmark was originally the construction lender.  The loan was to be assumed for all essential purposes by Fannie Mae and another Capmark entity was going to be the servicer of that loan.  Before the instant litigation, Capmark sold the servicing entity to Citibank. However, all of the financing as it currently stands with regard to this project is on Capmark's, *i.e.* the parent's, books.   Tr. at 7.

- The subsidiaries, these Membership Entities, were the conduits for equity investments that were required under various tax and other regulations that govern these types of projects.   Capmark took from its books the money to lend as a loan and the money to invest as an equity investor.  Capmark also gave a guarantee on certain bonds issued by Suffolk County IDA and sold to various bond purchasers . *Id*.

- At some point, Fannie Mae withdrew its financing, at which time the bonds lost their "A" rating and the bonds are in default.  The parties to this lawsuit blame each other for that collapse.  Capmark redeemed the bonds and so, all of the financing for this project has come from Capmark, the parent.  Tr. at 9.

- What the defendants actually requested of Judge Bianco was that the Court exercise its own discretion to stay or suspend this case for a number of months until such time as the Bankruptcy Court could straighten out certain matters because the "issues are so integrally related to each other."  Defendants maintain that there is no way to move forward "without implicating the estate and secondly . . . no prejudice to anybody in waiting a couple of months and giving a debtor breathing room. . ."  Tr. at 10-11.

- Defendants' counsel understands that there will be future filings in the Bankruptcy Court but does not know for sure whether the Membership Entities will be part of

---

[1]       All subsequent references to the Transcript of the December 17, 2009 Oral Argument are designated "Tr. at ___."

those future filings.  Defendants disagree with Plaintiff's position that there is some impediment to filing in the Bankruptcy Court because of the terms of the financing.  Tr. at 13.

- Defendants believe they fit the "inextricably intertwined" standard in any event. They base this argument on the assertion that the claims asserted by all parties are mirrors of each other.  Specifically, Defendants' counsel points first to Plaintiffs' primary claim that Barbara Saepia and her entities were wrongfully removed from involvement in the Belmont Villas project and then to Defendants' first counterclaim which seeks a declaratory judgment that the removal was proper. Defendants' counsel states that there is no severable claim, that the wrongful removal claim is against all of the defendants.  Tr. at 15.

- The damages claim, according to defendants, for cost overruns and delays, asserts that Capmark did not have the resources to get the project completed and, as a result, Plaintiffs lost their equity interest in the project.  Defendants' counterclaim contends that the Defendants did not cause the cost overruns and delays but, rather, Plaintiffs mismanaged the project and were removed.  Here, again, Defendants assert that the claim and counterclaim are inseparable.  Tr. at 16.

- In subsequent claims, Defendants allege that they are accused by Plaintiffs of impropriety in connection with the financing and the structure of the deal. In their counterclaim, Defendants argue that Plaintiffs committed fraud in their applications for financing and in their handling of the financing up front – again, "integrally related" claims.  Tr. at 17.

- Defendants claim the legal and factual issues presented in this case are "so intertwined as to be inseparable."  Tr. at 19.  In further support, Defendants' counsel states that the non–filing entities do not have any witnesses. In fact, counsel notes that the witnesses, the documents, and the money all belong to the filing entities.  Defendants assert that they will be prejudiced because the filing debtors, during this interim breathing period, will be distracted from their responsibilities to work on a plan of reorganization while simultaneously having to defend this litigation. In fact, counsel notes that Plaintiffs have expressed a desire to take the deposition of David Sebastian who is a high-ranking officer of Capmark Affordable Equities.  Tr. at 19.  Therefore, Defendants' counsel concludes, there is no way "the discovery of these entities would not implicate the time and the resources of the debtor."  *Id.*

- Defendants stress that there is no prejudice to the Plaintiffs here since Defendants are not seeking to put the litigation off indefinitely. Counsel asserted her understanding that there would be a reorganization plan within six months.

Tr. at 20.  Defendants propose a "short reasonable stay until such time as the plan is proposed and everything is dealt with in an orderly fashion."  Tr. at 23.

- The danger to the assets of the debtor should be clear, according to Defendants' counsel.  The debtor is the only financing entity on the Belmont Villas project and it has the outstanding loans that are enormous.  Defendants maintain that anything which gets decided in this action and has an impact on this property will have an impact on the debtors' claims.   Looking at the situation in any other fashion would be to proceed piecemeal with discovery and motions according to the Defendants.  Tr. at 46.

In voicing their continued opposition to a stay, Plaintiffs argue that the matters here are not inextricably interwoven.  Tr. at 25.  Moreover, Plaintiffs' counsel maintains that defendants cannot have it both ways  – the Membership Entities, Amtax and Protech, were clearly set up as separate, particular entities to avoid certain liabilities according to Plaintiffs.  Counsel argues that Defendants now come to the Court, when it benefits them to make such argument, to claim that the corporate entities are nonetheless closely intertwined.  Plaintiffs' counsel cited several cases for the proposition that a bankruptcy filing by a parent does not automatically stay actions against a wholly owned subsidiary  – a point which the Court had previously made to the parties.  Tr. at 28.

According to Plaintiffs' counsel, the contract rights of the one Amtax and two Protech entities are not part of the bankruptcy estate.  Tr. at 29.  Plaintiffs' counsel handed up several pages of documents produced during the discovery conducted to date.  Among those papers is the signature page of the partnership agreement of Belmont Villas, LLC that was entered into in October 2004.  The managing member is Plaintiff Chord.  Tr. at 30.  Plaintiffs' counsel points out that the bulk of the Belmont Villas entity is not in the bankruptcy estate.  Tr. at 34.   Because the Amtax entity and the two Protech entities are not in bankruptcy, Plaintiffs' counsel asserts

that there should be no question that they are not covered by the automatic stay and that discovery in this action should proceed.

When the parties concluded their arguments on December 17, I reviewed with them some of the cases cited by each side regarding the scope of a stay under § 362. Based on my reading of the cases, I advised the parties that it was necessary for the moving party to make a specific showing that actions taken relating to the non-debtor Membership Entities would have an adverse impact on the property of the bankrupt estate, as the Second Circuit observed in *In re 48th Street Steakhouse, Inc.* while citing the Ninth Circuit's decision in *In re Bialac*, 712 F.2d 426, ( 9th Cir. 1983). I also raised for discussion the case *In re Calpine Corp.*, 365 B.R. 401 (Bankr. S.D.N.Y. 2007) where the bankruptcy court discussed the Second Circuit's holding in *Queenie* that the automatic stay can apply to non-debtors but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate. 321 F.3d at 287. At that point, I told the parties that I did not believe that the Court had been provided sufficient information to determine any particularized impact on the debtor's estate. The parties were then given an opportunity to file supplemental briefing addressing these issues and were directed to make such filings by December 31. Tr. at 53 - 59.

As its supplemental briefing, Defendants submitted a two- page letter on December 31, 2009, along with the Amended and Restated Operating Agreement of Belmont Villas LLC. DE 157; DE 157, Ex. 1. Defendants' counsel advised that she had not been able to obtain a copy of the December 17, 2009 hearing transcript through the court system based on the intervening holidays. However, Defendants submitted exhibits, including a chart showing the relationship between the Protech and Amtax entities and their members, DE 157, Ex. 2, accompanied by

14

various stock ownership documentation.  DE 157, Ex. 3 - 8.  Noting once again that the ultimate

parent of Amtax and the Protech entities is Capmark Financial Group, Inc., a debtor here,

Defendants point to a specific section in the Operating Agreement which states that Capmark

Financial Inc. has priority for repayment from the profits of the project.   Counsel also notes that

pursuant to the Operating Agreement, Capmark Affordable Properties, Inc. is the entity that

provided the bridge loan which was required and is to be repaid through Amtax Holdings LLC.

Reiterating that the Capmark entities hold all of the debt on the Belmont Villas project,

Defendants' counsel went on to state that

> plaintiffs' claims are overtly aimed at undermining defendants' rights and
> ability to obtain repayment of the debt. When plaintiffs argue that the
> Non-debtors defendants AMTAX and Protech entities have "assets" in
> the form of contractual rights to distributions of profits or repayment of
> loans under the waterfall provision of the Belmont Villas LLC operating
> agreement (which plaintiffs argue as a justification for continuing the
> litigation against these entities), plaintiffs are in fact admitting the
> "immediate adverse economic consequences for the debtor's estates" –
> Capmark Affordable Properties Inc., Capmark Affordable Equity Inc.,
> and Capmark Finance, Inc., each a debtor, will be repaid through the very
> profits that plaintiffs seek to divert and would divert were they to obtain
> an adverse judgment against the Non-debtor defendants.

DE 157 at 2.  The Court has reviewed the above-referenced October 1, 2004 Belmont Villas

Amended and Restated Operating Agreement ("Operating Agreement") submitted to the Court

under seal as Exhibit 1 to DE 157.  Nowhere in the document is there a reference to "Capmark."[2]

Defendants' counsel draws the Court's attention to Section 6.2.1 of the Operating Agreement

which sets forth the order of priority for distribution of cash flow at the end of each quarter.  DE

157, Ex. 1 at 42.  Without breaching the confidentiality of the exhibits filed under seal, the Court

---

[2]        This absence is likely explained by the fact that Capmark became the successor to
GMAC Commercial Mortgage Corp., which is mentioned in the Operating Agreement.

15

notes the preamble statement in that section which says that the distribution is "subject to the terms of the Project Documents . . ." *Id.* The "Defined Terms" section of the Operating Agreement sets forth that the Project Documents consist of

> this Agreement, the Construction Contract, the Guaranty Agreement, the Mortgage Loan Documents, the Third Loan Documents, the Bridge Loan Documents, the Credit Allocation, the Extended Use Agreement, the Development Agreement, any Regulatory Agreement, the Management Agreement, the Forward Commitments and all other documents relating to the Project that are required by, or have been executed in connection with, any of the foregoing documents.

*Id*.

The other documents submitted by Defendants as sealed exhibits are the operating agreements of the Membership Entities and the by-laws of Protech Development Corporation. The Court has not seen any of the other agreements constituting the "Project Documents" which may well support Defendants' arguments here, but for which the Court can thus make no finding. However, the Court does note defense counsel's assertion that Capmark provided the bridge loan required in the Agreement. In the "Defined Terms" section of the Operating Agreement, under the entry "Bond Lender," the Court notes the following wording:

> **"Bond Lender"**: – means the Issuer in its capacity as the lender of the Bond Loan, Fannie Mae, as credit enhancer for the Bond Loan, GMAC Commercial Mortgage Affordable Housing Division, as Servicer of the Bond Loan on behalf of Fannie Mae, and during construction, prior to First Mortgage Commencement, GMAC Commercial Mortgage Corporation as the provider of the Construction Phase Credit Facility.

Id. The credit facility was therefore being provided by Capmark's predecessor in interest, GMAC Commercial Mortgage, which was also servicing the loan for Fannie Mae on the Belmont Villas project.

16

I had asked counsel to take a look at and to discuss in their supplemental submissions the import of *In re Calpine*, 365 B.R. 401 (Bankr. S.D.N.Y. 2007).  There, in referencing the Second Circuit's decision in *Queenie*, the bankruptcy court focused on the Court of Appeals' determination that the automatic stay can apply to non-debtors but "normally does so only when a claim against the non-debtor will have an *immediate adverse economic consequence for the debtor's estate*."  *In re Calpine*, 365 B.R. at 408 (quoting *Queenie Ltd. v. Nygard International*, 321 F.3d at 287) (emphasis supplied).  The court in *In re Calpine* noted that the Fourth Circuit, within two years of its decision in *A.H. Robins*, had retreated somewhat and held that the stay should not be applied to actions against a surety or guarantor of the debtor.  *Id*. (citing *Credit Alliance Corp. v. Williams*, 851 F.2d 119 (4th Cir. 1988).   Although noting that the Second Circuit had not explicitly addressed this issue, the court pointed to various courts within the Second Circuit that have held that § 362 should not be extended to stay non-debtor actions involving sureties or guarantors of the debtor.[3]  *Id.  See, e.g., Longview Equity Fund, LP v. McAndrew*, No. 06 Civ. 4304, 2007 WL 186769, at *6 (S.D.N.Y. Jan. 23, 2007) ("'[A] Section 362 stay is not ordinarily extended to entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the Chapter 11 debtor.'" (quoting *CAE Indus. Ltd. v. Aerospace Holdings Co.*, 116 B.R. 31, 32 (S.D.N.Y. 1990)).

In discussing the court's finding in *In re Calpine*, Defendants' counsel states that the court there directed its ruling to the issue of the burden and distraction of key employees from the

---

[3]      The Court notes that Defendants' position at oral argument was that Capmark was a guarantor on certain bonds issued by Suffolk County IDA (see page 11 above), which Capmark ultimately redeemed after Fannie Mae withdrew its financing and the bonds went into default. The Capmark entities involved in this litigation are the debtors, not guarantors of the debtors.

17

debtors' restructuring efforts and did not address the risk of collateral estoppel and evidentiary prejudice to the debtor. DE 157 at 2.  Arguing that both grounds pertain to the instant case, Defendants counsel asserts:

> First, as to the risks of evidentiary prejudice, there is and can be no dispute that the claims against the debtor and non-debtor entities are identical and undifferentiated such that all fact, legal, evidentiary and other issues are inextricably intertwined. Plaintiffs have not identified a single issue that could be disentangled. Even though rulings would be null and void and would have to be reconsidered in the action against the debtors, the evidentiary prejudice is inescapable. Second, plaintiffs identify David Sebastian as a key witness, and he is a high-ranking officer involved in the debtors' restructuring efforts. But most significantly, the equities tip in favor of the stay. Against the injury to the parties and to the Court that would result in having mirror image claims tried in two proceedings with all the attendant waste of resources, risk of inconsistent decisions and evidentiary prejudice, plaintiffs have shown no injury to themselves or the public interest.

*Id*.  Ultimately, Defendants contend, a ruling against the non-debtor entities here would have an immediate adverse economic consequence for the debtors' estate.  *Id*.

As to Defendants' argument regarding the "inextricably intertwined" nature of the claims, *pro se* Counterclaim-Defendant Roland Conde, in opposing any stay, states that this argument by the Defendants is of recent vintage.  Specifically, Mr. Conde asserts that the exact opposite position was espoused by Defendants earlier in this case.  He points to the Affirmation of Defendants' counsel, Catherine McGrath, Esq., filed in Opposition to Plaintiffs' earlier Motion for Summary Judgment.  *See* DE 20.  In particular, Conde draws attention to Defendants' response to Plaintiffs invocation of the alter ego doctrine in which Defendants' counsel stated that discovery is required "to determine the basis for Plaintiff's theory that it can disregard corporate distinctions. . ." and that "the parties intended that there be no merger of identity of the

18

entities."  DE 159 (quoting DE 20, ¶ 27).

Whether a particular judicial proceeding "falls within the scope of the automatic stay must be determined by looking at the proceeding 'at its inception.'" *Maritime Elec. Co. Inc. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1992) (quoting *Assoc. of St. Croix Condominium Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 449 (3d Cir. 1982)).  As the court observed in *Maritime Electric*,

> All proceedings in a single case are not lumped together for purposes of automatic stay analysis.  Even if the first claim filed in a case was originally brought against the debtor, section 362 does not necessarily stay all other claims in the case.  Within a single case, some actions may be stayed, others not.  Multiple claim and multiple party litigation must be disaggregated so that particular claims, counterclaims, crossclaims and third-party claims are treated independently when determining which of their respective proceedings are subject to the bankruptcy stay.

959 F.2d at 1204-1205.  Having reviewed the circumstances of the instant case as well as the applicable case law, I find that Defendants have not met their burden to establish the "unusual circumstances" test set forth in *A.H. Robins*.  Consequently, I find that the non-debtor Membership Entities are not covered by the automatic stay provisions of § 362.  What Defendants have asserted are conclusory statements regarding the generalized impact on corporate debtors who have an extensive portfolio of such real estate investments all over the country.  The magnitude of the debtor Defendants' holdings was demonstrated in counsel's own words when she alluded to the fact that in filing for Chapter 11, the client checked off the highest monetary box on the bankruptcy petition form, which is for filings estimated to be in excess of $1 billion.  In addition, given the restrictions on the presumptive number of depositions which can be taken under the Federal Rules, without the parties stipulating otherwise  –  a circumstance

the Court does not envision here based upon the contentious nature of this litigation to date – the Court finds that there would be no "immediate and adverse impact" on the debtors' estate as a result of litigation involving a single project in New York.   Likewise, the Court finds diminished the likelihood that key employees will be burdened and distracted from Capmark's restructuring efforts or that David Sebastian cannot make himself available for deposition on reasonable notice.

Although it may be that the matters here are "inextricably intertwined," Defendants have not pointed to any concrete, specific examples of how that is so, other than the generalized conclusions presented in their arguments.   Nor have they introduced deposition testimony or affidavits from anyone with first-hand knowledge of the facts which might support their assertions in this regard.   This Court has not been provided with any information from the Delaware Bankruptcy Court regarding the scope of the automatic stay and any impact on the non-debtor wholly owned subsidiaries who are Defendants in the instant action, nor has the Court been made privy to any arguments proffered by the debtor entities as to the non-debtors here.   In reaching a determination here, the Court, operating in somewhat of a vacuum, has considered (1) if Plaintiffs are permitted to carry on discovery of the purportedly solvent co-defendants in the breach of contract action without the ability to carry on discovery of the debtors until some time in the future, will there be wasteful duplication? (2) will the break in discovery sequencing waste judicial resources? (3) will the rights of the solvent co-defendants be prejudiced? (4) will Defendants be hampered in their preparation of their own defense without discovery from the debtors?   Based on an evaluation of the information made available to the Court, the answer to these questions at this time is "no."   The Court also notes that if Defendants are convinced of the

factual underpinnings for such relief, there is nothing preventing them from applying to the Bankruptcy Court for the relief that they seek here with regard to an interpretation of the scope of the automatic stay.

**B.      Defendants' Request for a Discretionary Stay**

As the Defendants have noted in their papers ". . . [this] matter has been effectively stayed by Magistrate Tomlinson as a result of issues relating to the newly added counterclaim defendant, Roland Conde." DE 148 at 2.  The debtor Defendants made their Chapter 11 filings on October 25, 2009.   In light of the motion practice in this case, discovery has effectively been stayed for five months.  The Court does have the power to grant a stay in its discretion.   District courts often "utilize their discretionary powers to stay proceedings in the interest of justice and in control of their dockets."  *Teachers Ins. & Annunity Ass'n of Am.*, 803 F.2d at 65 (citing *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 544-545 (5th Cir. 1983).   Based on Defendants' arguments that (1) the claims are undifferentiated as to the debtor versus non-debtor Defendants, (2) the wholly owned subsidiaries/Membership Entities have no employees and no documents, (3) the witnesses would have to come from the Capmark entities, and (4) the resources to defend the actions belong to Capmark, I will extend the *de facto* stay for a brief additional period.  It would be inappropriate to grant an indefinite stay or to condition lifting a stay upon resolution of the reorganization proceedings.  *See Stoller v. Baldwin-Untied Corp.*, 41 B.R. 884, 892 (S.D. Ohio, 1984).  Therefore, I am extending the discretionary stay only until May 3, 2010, which effectively will have given the debtors the six month "breathing room" period which counsel sought.

A new schedule for completion of the pre-trial phase of this case will be entered

separately, along with the Court's rulings on the outstanding discovery motions.


                                             **SO ORDERED**

Dated: Central Islip, New York
       March 25, 2010

                                        /s/ A. Kathleen Tomlinson
                                        A. KATHLEEN TOMLINSON
                                        U.S. Magistrate Judge